## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL RIVERA, STEPHEN KENSINGER, DEBORAH JOY MEACOCK, and REBECCA SCHEUNEMAN, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| ALLSTATE INSURANCE COMPANY, and JUDY GREFFIN | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Now come Plaintiffs, Daniel Rivera, Stephen Kensinger, Deborah Joy Meacock and Rebecca Scheuneman, by and through their attorneys, RDS LAW, and for their complaint against Defendants, Allstate Insurance Company and Judy Greffin, state as follows:

### Introduction

1.      Plaintiffs Daniel Rivera, Stephen Kensinger, Deborah Joy Meacock and Rebecca Scheuneman bring this action to redress the unlawful, defamatory, and tortuous actions of Defendants culminating in the termination of Plaintiffs' employment with Defendant Allstate Insurance Company in violation of Plaintiffs' rights under federal statutes and state law as set forth herein.

### Jurisdiction and Venue

2.      Plaintiffs seek relief under the Fair Credit Reporting Act, (the "FCRA"), 15 U.S.C.A. § 1681, et. seq. and under tort theory of liability.

3.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

4.　　　　This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367, as they are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the Constitution of the United States of America.

5.　　　　Venue of this action in the United States District Court for the Northern District of Illinois is proper under 28 U.S.C. 1391(b) because the events giving rise to the claims alleged herein, including Plaintiffs employment and termination, occurred within the Northern District of Illinois.

## The Parties

6.　　　　Plaintiff, Daniel Rivera ("Rivera") is a citizen and resident of the State of Illinois.

7.　　　　Plaintiff, Stephen Kensinger ("Kensinger") is a citizen and resident of the State of Minnesota.

8.　　　　Plaintiff, Deborah Joy Meacock ("Meacock") is a citizen and resident of the State of Illinois.

9.　　　　Plaintiff, Rebecca Scheuneman ("Scheuneman") is a citizen and resident of the State of Illinois.

10.　　　　Defendant, Allstate Insurance Company ("Allstate") is a corporation incorporated under the laws of the State of Illinois with its principal place of business in Northbrook, Illinois.

11.　　　　Defendant, Judy Greffin, ("Greffin") upon information and belief, is a citizen and resident of the State of Illinois.

## Statement of the Case

2

12.     Plaintiffs are all former employees within the Equity Division of Allstate.

13.     The Equity Division of Allstate was in charge of managing equity portfolios for both the Property & Casualty Company (hereinafter referred to as "AIC") and Allstate's Pension plans (the "Plans") as well as Convertibles for Allstate Financial.

14.     Plaintiff Rivera was the Head of the Equity Division at the time of his discharge.

15.     Rivera began working for Allstate in 2004 with the title of Managing Director Equities, reporting to Dorothy "Dee" Even, Senior Managing Director and Head of the Equity Division.

16.     In August of 2007 Rivera became the Head of the Equity Division.

17.     The Equity Division included numerous sub-divisions, or teams, including trading, quantitative, value, growth, convertible securities, and administrative support.

## The Growth Team

18.     Plaintiffs Kensinger, Meacock, and Scheuneman comprised the growth team.

19.     Scheuneman started at Allstate in 1999 as an Intermediate Analyst on the Convertibles portfolios.

20.     In 2000, Scheuneman made a lateral move from the convertible securities team to common equities.

21.     After several promotions, Scheuneman became a Portfolio Manager on the growth team.

22.     Meacock joined Allstate in 2006 as an Equity Portfolio Manager, Growth Team Leader.

23.     Meacock was charged with developing a Growth Equity team and process.

24.     In 2007, Meacock hired Kensinger to join the growth team as an Equity Portfolio Manager.

25.     The growth team was responsible for managing growth portfolios of individual securities.

26.     The growth team managed a number of portfolios, a Core Growth portfolio, a Concentrated Growth portfolio, and a Small/Mid cap growth portfolio.

27.     Kensinger also managed a Technical Portfolio, using a technical analysis strategy.

## Managing the Portfolios

28.     Kensinger, Meacock and Scheuneman did not have the ability to move or otherwise transfer money in, out or between the portfolios.

29.     While Rivera had the ability to move money among various AIC portfolios, Rivera did not have the ability to move money within the Plans.

30.     The authority to move money within the Plans was restricted to the Plans manager David Walsh.

31.     On most occasions, Rivera would receive a communication, typically via e-mail, directing him to commit capital from either Allstate's Portfolio Management Group ("PMG") or David Walsh of the Plans.

32.     The communications to Rivera from PMG or the Plans would inform Rivera specifically how much money needed to be added to or sold from the portfolios.

33.     These communications would also provide Rivera with a specific time frame in which to execute the movement of money among the portfolios.

34.     Once Rivera received such a communication from PMG or the Plans regarding the requested movement within the portfolios, Rivera would then forward the relevant e-mail to the entire division and instruct a member from the Trading team to make the program trades providing the same monetary and time parameters that had been communicated from PMG or the Plans.

35.     The Trading team would then execute the program trades at their discretion, so long as it was within the parameters sent down from PMG or the Plans through Rivera.

36.     On rare occasions, Rivera would inform the growth and/or value teams of requested portfolio activity, leaving the growth and/or value team with control over sending the requested trade to be executed by the trading team.

37.     Rivera would only move money among the AIC portfolios when he executed the Alpha Migration strategy, which was short-term tactical asset allocation – a common investment procedure designed to maximize AIC's total return as prescribed by Allstate's CIO.

## Pay for Performance

38.     In addition to annual salaries, some members of the equity division were eligible to earn additional bonus compensation based upon Allstate's "pay for performance" plan (the "PFP plan").

39. In general, under the PFP plan, the additional bonus compensation was dependant on the return on investments from the equity division's managed portfolios, in addition to the overall Investment Department results and overall company results.

40. The additional bonus compensation under the PFP plan was also dependent on a subjective component.

41. A full-time staff managed the PFP plan.

42. Dee Even, former Head of the Equity Division, has stated that all performance measurement calculations were audited before any PFP bonus payments were made.

43. Under the PFP Plan, Portfolios were typically measured against their respective benchmarks, specified for each portfolio in the PFP.

44. Potential payouts were based on the relative performance of managed portfolios compared to their benchmarks.

45. Maximum bonus potential was capped at a certain point (+115 basis points, or +1.15% in 2007).

46. Returns above index +1.15% accrue entirely to AIC and the Plans with no more incentive earned by the managers.

47. Other divisions of Allstate Investments participated in the same pay for performance plan with metrics set for each specific asset class.

48. On November 20, 2008 Greffin sent a memo to all PFP participants stating that due to unprecedented turbulence in the markets causing capital preservation and risk mitigation to become paramount, PFP payouts would be 100% discretionary.

49.     For 2009, PFP measures were changed dramatically.  The new measures were for absolute return of the portfolios as opposed to relative, and measured the return of the client's entire portfolio rather than the portion of the portfolio that the employee is responsible for.

### Dietz Calculations

50.     Allstate utilizes the Modified Dietz method to measure the performance of its investment portfolios.

51.     The Modified Dietz method evaluates a portfolio's return based upon an approximated time weighted analysis by identifying and accounting for the timing of all random cash flows.

52.     The Modified Dietz method weights individual cash flows by the amount of time that those cash flows are held or absent from the portfolio.

53.     When cash flow is injected or withdrawn from a portfolio, the Modified Dietz method assumes a constant rate of return on the portfolio during the period of time between portfolio valuations.

54.     This assumption eliminates the need to know the value of the portfolio on the date of each cash flow.

55.     As a result of the lack of portfolio valuation at the time of each cash flow, the Modified Dietz method provides a less accurate estimate of the true time-weighted rate of return.

56.     In certain circumstances, the estimate of the true time-weighted rate of return provided by the Modified Dietz method can be greatly distorted.

57.     The estimate provided by the Modified Dietz can be greatly distorted when large cash flows occur, when no cash is accounted for, and/or when cash flows

occur during periods of high market volatility – i.e., the portfolio's returns are significantly non-linear.

58.     Allstate did not have a portfolio management accounting system that accounted for cash in individual portfolios.

59.     Debbie Rutzky, who calculated performance for Allstate using Dietz, informed Kensinger that Allstate was aware of Dietz effect caused by activity within the portfolios, and consequently backed it out of the performance calculations routinely.

60.     Rutzky further informed Kensinger that the Dietz effect does not only exist in the Equity division, but in all of the Allstate portfolios, including the entire fixed income division.

61.     Dee Even repeatedly stated that the Dietz impact faded out of the performance numbers over time.

62.     On numerous occasions, Dee Even, Rivera and members of the Growth Team recommended that the company upgrade the performance measurement system to one that met industry standards and eliminate any Dietz impact.

63.     Each time Allstate responded to these recommendations by saying that a new system was too expensive.

**The Growth Team's Strategy**

64.     The Growth team pursued a strategy of investing in high growth/high potential stocks.

65.     Such stocks can be volatile.

66.     Since the stocks the Growth team invested in were volatile, trading activity tended to be above average.

67.     The momentum growth-oriented investment strategy often required that the growth team would buy stocks as they went up and sell stocks as they went down in an effort to achieve adequate returns while minimizing risk to the portfolios.

68.     The trade directives coming from PMG and the Plans often involved very large cash flow injections or withdrawals.

### Growth Team Excels in 2007

69.     For the calendar year of 2007, the growth team exceeded its performance goals in both the core growth portfolio and the concentrated growth portfolio.

70.     In 2007, the growth team all received near maximum bonuses.

71.     The Core Growth portfolio outperformed its benchmark by 303 basis points, the Growth Concentrated portfolio outperformed its benchmark by 1570 basis points, and the AIC Technical Portfolio exceeded its benchmark by 1635 basis points.

72.     Anything greater than 115 bonus points had no affect on Plaintiff's PFP bonus compensation.

73.     In addition, the growth team earned significant praise for their work in 2007, including the award of "Best Investment Team 2007" at Allstate.

### Do No Harm Through Dietz

74.     Due to the large cash flows directed for movement in and out of the portfolios, as well as the volatile markets in which the activity was taking place, all

the divisions of Allstate were aware of the possibility of Dietz distortions in the performance measurement calculations.

75.     Additionally, Allstate did not account for cash at the individual portfolio level, further distorting Dietz calculations at the portfolio level.

76.     Because it was broadly well-known throughout the company that large movements of cash affected Dietz, Allstate's policy was to do no harm to the portfolios.

77.     Thus, if money was being added to a portfolio, the Equity Division was directed to execute the transaction on a day when the market was down (buy low).

78.     If the directive was to raise cash (sell from the portfolios), the Equity Division was directed to execute the transaction on a day when the market was up (sell high).

79.     This direction came from the PMG (Portfolio Management Group), PMA (Performance Measurement Authority) and the clients.

## Rivera's Alpha Migration Strategy

80.     Vision 2010 was a strategy developed by Ric Simonson and Greffin to double the Investment Department's 'Value-Add' to Allstate.

81.     In response to Vision 2010, Rivera presented a strategy entitled Alpha Migration aimed at practicing tactical short-term asset allocation.

82.     The goal of the Alpha Migration strategy was to try to have money in the portfolios that were doing the best at any given time, subject to diversification and risk parameters for the portfolios.

## Managing Tail Risk

83.     In January 2008 Rivera organized an off site meeting with various members of Allstate Investments.

84.     Because of perceived risk in the equity market discussion revolved around various strategies to hedge Allstate's equity exposure.

85.     Accordingly, Kensinger and Rivera made a recommendation that Allstate hedge the equity exposure for a possible downturn in the market.

86.     Specifically, with the S&P 500 at approximately 1400, Kensinger and Rivera recommended Allstate buy S&P 500 puts at 1300 and fund the majority of the cost by selling S&P 500 calls at 1500.

87.     This recommendation was declined by Allstate as they thought it would be too expensive.

88.     In the fall of 2008 with the S&P 500 substantially lower, a strategy like this was finally implemented.

## The Growth Teams' Success is Acknowledged

89.     In early 2008, Meacock was invited to a meeting with Ric Simonson and Judy Greffin, the CIO and COO of Allstate at that time, respectively.

90.     Simonson and Greffin informed Meacock that they were very pleased with Meacock's contributions.

91.     Simonson and Greffin also informed Meacock that she had been identified as a key contributor to the investment department's success.

92.     Simonson and Greffin further stated that they wanted to make sure that Meacock stayed at Allstate.

11

93.     Accordingly, Simonson and Greffin informed Meacock that she would be a part of a small group of "high potential employees" which included less than 5% of the department, to receive additional long term compensation.

94.     Towards the end of 2008, Simonson retired as CIO and Greffin replaced him as CIO.

### The Market Crashes

95.     In or around September 2008, the deterioration of the financial system began to accelerate.

96.     As a result, the financial markets began to crash.

97.     Allstate instructed the growth team to hold their positions within the portfolios until told to sell for tax-loss purposes.

98.     Allstate further stated that the PMG would inform the growth team when to realize losses as part of a tax strategy.

99.     At this point in time, the growth team was no longer managing the assets with full discretion.

100.    In 2009, the investment objectives for the entire Equity division had been changed from relative returns to absolute returns.

101.    This change was made in an effort to lessen the risk within the portfolios so that capital could be re-built.

102.    Rivera presented a conventional absolute return strategy, but that was rejected by Greffin.

103.    As of September 30, 2009, the Equity division had attained the maximum absolute return as well as other metrics PFP plan goal for the year.

### Allstate's Investigation

104.    On May 25, 2009 the Performance Measurement department restated 2009 performance numbers to strip out the Dietz effect.

105.    The performance of all growth portfolios improved, showing that Dietz had negatively impacted performance of the growth portfolios.

106.    The restated numbers for the value portfolios were worse, showing that Dietz had improved the performance of the value portfolios.

107.    Rutzky told Scheuneman that when 'they' saw that the performance numbers improved, they were surprised and upset.

108.    On July 30, 2009, Scheuneman was asked to go to a meeting titled "Ethics and Compliance."

109.    When Scheuneman arrived at the meeting, she was unexpectedly met by two attorneys from Steptoe and Johnson.

110.    The Steptoe attorneys asked questions about process, trading, and eventually Dietz.

111.    The meeting lasted for over an hour.

112.    Scheuneman knew that the situation was serious, but felt strongly and confidently that she and her co-workers had done nothing wrong.

113.    That same day, Rivera was asked to go to a conference room on the first floor of Allstate's G building.

114.    When Rivera arrived in the conference room, he was met by the two attorneys from Steptoe and Johnson, and Susan Rosborough, an attorney in Allstate's Ethics and Compliance department.

115.    Rosborough informed Rivera that he had a right to have an attorney present, and then exited the room.

116.     The two attorneys from Steptoe and Johnson interviewed Rivera about Dietz.

117.     Rivera answered the questions to the best of his ability.

118.     The "conference" lasted approximately two hours.

119.     Nothing further was heard from any internal or external lawyer of Allstate until October 6, 2009.

### Rivera is Told the Equity Division is Closed

120.     On October 6, 2009, at or around 9:00am, Rivera was called to Judy Greffin's office.

121.     Once at Greffin's office, Rivera was met by Greffin, Rosborough and Brett Winchell, a representative from Allstate's Human Resources Department.

122.     Rivera was informed that a decision had been made to "focus on the core" and to disband the Equity Division of Allstate.

123.     Rivera was further informed that effective immediately, Allstate would outsource the management of Allstate's equities to Goldman Sachs.

124.     Rivera questioned whether Allstate was going to take care of his department financially, in light of the fact that many of the people within the division had stock options.

125.     In response, Rivera received only vague retorts.

126.     Rivera was then asked to see the Steptoe lawyers again at the conclusion of the meeting.

127.     Rivera replied that he would not meet again with the Steptoe lawyers unless he was represented by counsel.

128.     Rivera was then directed to go home, and told that he would be contacted within the week.

129.     Greffin told Rivera that he was not discharged.

130.     Rivera asked Greffin if he could join her in telling the Equity Division of Allstate's decision to disband the division.

131.     Greffin told Rivera that she preferred if Rivera was not there.

132.     After the meeting, Rivera gathered a few personal items and left Allstate's premises.

## Greffin Informs the Rest of the Division

133.     That same day, October 6, 2009, an email was sent out to the members of the Equity Division directing them to go to Greffin's conference room.

134.     In addition to Greffin, Rosborough and Winchell were present

135.     Greffin informed the Equity Division of Allstate's decision to close the division.

136.     Greffin stated that everyone within the division would be affected by the decision with the exception of the division's two Convertible Managers

137.     Greffin stated that each individual would have an interview with Rosborough, followed by a meeting with Winchell who would inform them of their employment status.

138.     At the time of this meeting, nobody in the room had been informed that Rosborough was an attorney, nor that they would be interviewed by any attorney.

## Each Member of the Growth Team Meets with the Steptoe Lawyers

139.    Later in the day, on October 6, 2009, the members of the growth team attended their interviews with the Steptoe lawyers.

140.    Meacock met with Steptoe lawyers Matt Herrington and Matt Kepniss.

141.    Meacock was asked if she understood ERISA and who had what trading authority in which portfolios.

142.    Meacock was also asked many questions about various trades and movement of money between portfolios.

143.    During the meeting, Meacock was shown copies of old e-mails and asked about Deitz.

144.    She stated that Deitz existed because Allstate would not invest in a state of the art performance measurement system, a portfolio management system or a cash management system.

145.    The meeting was not contentious.

146.    Meacock fully cooperated with the meeting, and left with no personal concerns about any of her actions.

147.    Scheuneman also met with the Steptoe lawyers on October 6, 2009.

148.    During Scheuneman's meeting, the Steptoe lawyers repeatedly stated that "the only trading that generated significant Dietz was large program trades, which you had no control over, correct?"

149.    Like Meacock, Scheuneman left the meeting feeling confident that it was not her that they were after.

150.    A short time later Scheuneman was informed that her meeting with Human Resources was scheduled for Friday, October 9.

151.    Kensinger also met with the Steptoe lawyers on October 6, 2009.

152.    In his meeting, Kensinger was asked about Dietz and the movement of money among accounts.

153.    Kensinger informed Herrington that Dietz existed because of antiquated systems and affected not just the Equity division, but the entire investment department, including fixed income.

154.    Herrington acted surprised when he was informed by Kensinger that Dietz occurred throughout the entire investment department.

155.    Kensinger was told he would have his meeting with Winchell of Human Resources on Friday, October 9, 2009.

<u>**Rivera Returns to Allstate**</u>

156.    On October 8, 2009, Rivera emailed Winchell to inform him that Rivera was going to come in to pack up his office on October 8, 2009.

157.    Accordingly, Rivera went to Allstate on October 8, 2009 to pack up his belongings from his office.

158.    Unbeknownst to Rivera, Rivera's security pass had been disabled.

159.    Rivera went to the loading dock and presented his credentials.

160.    Not having any orders to the contrary, security allowed Rivera to enter the building.

161.    Rivera went to his office and then checked in with some of the individuals from the Equity division.

162.    As the head of the Equity division, Rivera was concerned with the Equity team's welfare and morale.

163.    Meacock stopped by Rivera's office to say hello.

164.     Rivera expressed how sorry he was that the Equity division had been closed.

165.     Meacock and Rivera spoke for approximately 30 minutes.

166.     Kensinger also spoke to Rivera for approximately 15 minutes.

167.     Rivera and Kensinger discussed their shock at what had happened, and their uncertainty as to the reasons why the circumstances had arisen.

168.     Rivera also expressed his concern for the individuals in the Equity Division.

169.     Unbeknownst to Rivera at the time he had returned to Allstate, Winchell had responded to Rivera's email and stated that Rivera should first come to the front desk and have them inform Winchell of Rivera's arrival.

### Fallout from Rivera's Return

170.     Kensinger's Human Resources Department meeting with Winchell had been scheduled for October 9, 2009.

171.     On October 9, 2009, Kensinger was informed that his meeting with Winchell had been rescheduled for a different time on October 9, 2009 "because something had come up."

172.     On October 9, 2009, Kensinger went to the conference room to meet with Winchell regarding his employment status with Allstate.

173.     Winchell was in the conference room with two women who Kensinger did not know.

174.     Winchell introduced the women and then left the room.

175.     One of the women was a Vice President of Human Resources, and the other was a lawyer in the Human Resources Department.

176.    They said that Rivera had been seen on the sixth floor on Thursday and that Kensinger had been seen talking to him.

177.    They asked Kensinger if there was anything he wanted to share with them regarding Rivera's visit.

178.    Kensinger asked "like what?" and proceeded to explain that Rivera was just concerned about his people.

179.    The two women then asked Kensinger some questions about Dietz.

180.    At one point, the lawyer asked Kensinger point blank if he had ever tried to game the performance measurement system.

181.    Kensinger replied emphatically that he did not.

182.    Meacock had received a similar email to Kensinger that she would meet with Winchell on Friday, October 9, 2009.

183.    The morning of October 9, 2009, Meacock was informed that there were some "scheduling issues" and that her meeting would need to be postponed.

184.    At some point on October 9, 2009, Winchell stopped by Meacock's office and said: "I will take you to meet with them."

185.    Meacock replied "I thought I was meeting with you."

186.    Winchell then responded by saying "Oh, of course you are."

187.    Winchell and Meacock went down to the first floor of the building and entered a meeting room where Winchell introduced Meacock to the same two women that Kensinger had met with.

188.    Winchell promptly left the room after the introductions.

189.    Meacock felt as though she had been ambushed.

190.     Similar to the meeting with Kensinger, the women told Meacock that she had been observed speaking with Rivera the day before and wondered if Meacock had "anything to share."

191.     Meacock responded by saying "No, I didn't know I couldn't talk to Dan [Rivera]."

192.     Like the question posed to Kensinger, the attorney asked if Meacock had ever gamed the performance system.

193.     Meacock responded by saying that she had not.

194.     Meacock told them that she didn't understand the questions being asked of her because she had believed she was going to a meeting about her status.

195.     The two women told Meacock to be patient but that something had come up.

196.     Scheuneman had a meeting scheduled with Winchell for October 9, 2009, but was called by Winchell and informed that the meeting would need to be postponed.

197.     Winchell stated that some additional information became available that required further investigation.

198.     On October 26, Rivera was asked to again meet with attorneys for Allstate as part of their continued investigation.

199.     Rivera met with four lawyers representing Allstate at an off-site location.

200.     Two of the lawyers representing Allstate at this meeting were Matthew Herrington and Paul Ondrasik of Steptoe and Johnson.

201.     Rivera was asked numerous questions about Dietz, specific email communications, and the process of moving money between portfolios.

202.     Rivera welcomed the opportunity to clarify the misconceptions that Allstate had regarding Dietz and the Equity division's conduct in order to demonstrate that everyone within the division had only acted in Allstate's best interests.

203.     As such, Rivera answered each question openly and honestly as it was posed to him.

204.     The meeting lasted approximately two hours.

205.     The attorneys questioning implied that Rivera and the growth team had timed their portfolio activity so they could manipulate the Dietz calculation to embellish their performance measurement numbers used to calculate bonus compensation.

206.     In the meantime, the growth team's colleagues within the Equity division were returning from their Human Resources meetings having been terminated without cause, and receiving severance packages.

## **Rivera and The Growth Team are Terminated For Cause**

207.     On December 3, 2009, Kensinger, Meacock, Scheuneman and Rivera were finally asked to meet with Winchell regarding their employment status with Allstate.

208.     While they all met or spoke with Winchell individually, they each received the same message from Winchell.

209.     Winchell told them that they were being terminated for cause for violating the conflict of interest provision of the code of ethics with regard to the Pay for Performance plan.

210.     Winchell also told them that they would not be receiving any severance package, or any additional compensation from Allstate.

211.     During her meeting with Winchell, Scheuneman asked for specifics regarding what Allstate believes she did to warrant a termination for cause.

212.     Winchell refused to elaborate.

213.     Scheuneman asked if she could see the 2007 and 2008 numbers that were restated to strip out any Dietz affect.

214.     Winchell said that he could not provide them.

215.     Rivera and the growth team had been previously provided with the 2009 restated numbers which demonstrated that Dietz distortions actually hindered rather than benefited their performance measurements.

216.     Like Scheuneman did at her meeting with Winchell, Kensinger asked Winchell for specific information regarding what he had done to violate the code of ethics, and when it was done.

217.     Winchell refused to provide any additional information.

218.     Kensinger then asked if he would receive anything in writing.

219.     Winchell said that there would be nothing in writing.

220.     Kensinger responded by asking: "you mean you are firing me and not telling me why?"

221.     In response, Winchell just shrugged.

222.     Winchell only stated that Allstate had been very diligent and careful in coming to their decisions.

223.     Meacock also asked Winchell for more specific information during her meeting.

224.     Winchell again refused to provide any additional information.

225.     Meacock asked for Winchell to explain what it is that she did to warrant a termination for cause around eight to ten times.

226.     Winchell responded to each of Meacock's requests with a refusal to respond.

227.     Winchell did inform Meacock that her last official day would be the following day, December 4, 2009, and that he would not be available to speak with her again.

228.     Meacock asked what Allstate would say to prospective employers.

229.     Winchell said that the only thing Allstate would ever tell anyone was Meacock's name, title, and years of service.

230.     Winchell said that Allstate would not tell a prospective employer that Meacock had been terminated for cause.

231.     Meacock was brought to her office to collect her belongings and then escorted to the elevator.

232.     In departing Allstate's facilities, Meacock asked Winchell to please specifically tell Greffin that Meacock requested a meeting to have an explanation of what Allstate claimed Meacock did to violate the Code of Ethics policy.

233.     Like Scheuneman, Kensinger, and Meacock, Rivera questioned Winchell for what exactly he did to violate the conflict of interest policy of the code of ethics.

234.     Winchell refused to elaborate any further.

235.     Like he had stated to Meacock, Winchell told Rivera that Allstate would not tell prospective employers that Rivera had been terminated for cause.

## The End Results

236.     At the time that Greffin disbanded the Equity division and transferred its assets to Goldman Sachs, there were nineteen members of the division.

237.     Only two of the members of the division were not terminated.

238.     Of the remaining seventeen members of the division, only five were dismissed for cause – the Head of the Division, the Head Trader, and the entire growth team.

239.     Rivera, Meacock, Kensinger, and Scheuneman were four of the five total employees within the division that were terminated for cause.

240.     Allstate has never informed the Plaintiffs what they did to violate the code of ethics.

## Greffin Continues to Talk

241.     After Rivera, Meacock, Kensinger, and Scheuneman were terminated for cause, Greffin informed other Allstate employees of their supposed reasons for termination.

242.     Greffin told Allstate employees that Plaintiffs added to portfolios in a manner that would increase and/or minimize damage to their performance calculation under the Pay for Performance Plan.

243.    Greffin told Allstate employees that Plaintiffs raised cash from the portfolios in a manner that would increase and/or minimize damage to their performance calculation under the Pay for Performance Plan.

244.    Greffin told Allstate employees that Plaintiffs were timing the trades in order to maximize their potential bonus compensation under the Pay for Performance Plan.

245.    Greffin told Allstate employees that Plaintiffs were using the Dietz calculation to increase their work performance measurements.

246.    Greffin told Allstate employees that Plaintiffs were manipulating the data under the Pay for Performance Plan for their own financial benefit.

247.    Greffin told Allstate employees that Plaintiffs were "gaming" the Pay for Performance Plan.

248.    Greffin told Allstate employees that Plaintiffs violated the Conflict of Interest provision of Allstate's code of ethics.


## COUNT I
## Fair Credit Reporting Act (15 U.S.C.A. § 1681)
### (Against Allstate)

249.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-248 of its Complaint as if the same were fully set forth at length herein.

250.    Allstate hired attorneys and/or third parties as part of an investigation surrounding the conduct of Plaintiffs while they were employees of Allstate.

251.    Those conducting the investigation prepared some form of communication or investigative report that was generated as a result of the investigation which summarized its findings regarding Plaintiffs conduct.

25

252.     As a result of the investigation, communication and/or report, Allstate decided to take adverse action against Plaintiffs employment with Allstate – terminating Plaintiffs for cause.

253.     Allstate failed to disclose to Plaintiffs a summary containing the nature and substance of the communication upon which their termination for cause was based as required by 15 U.S.C.A. § 1681a(x)(2).

254.     Allstate's acted willfully in its failure to disclose to Plaintiffs a summary of the communication upon which adverse employment action was taken against them.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant Allstate:

(a)     ordering Defendant Allstate to produce and disclose the summary of the communication upon which the adverse employment action was taken against Plaintiffs;

(b)     awarding Plaintiffs compensatory damages;

(c)     awarding Plaintiffs its costs and fees for bringing this action, including reasonable attorneys fees; and

(d)     awarding Plaintiffs such other relief as the Court deems just and appropriate under these circumstances.

## COUNT II
### Defamation
### (Against both Defendants)

255.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-248 of the Complaint as if the same were fully set forth at length herein.

256.     The statements made by Allstate and Greffin in paragraphs 241-248 of the Complaint were directed at Plaintiffs' in their respective professional capacities and relate to the manner in which the Plaintiffs do business.

257.     Allstate and Greffin's statements were published to various Allstate employees and personnel.

258.     The aforementioned statements made by Allstate and Greffin are outlandish and untrue.

259.     As a proximate result of the defamatory statements made by Allstate and Greffin, Plaintiffs suffered, and continue to suffer, injuries, including injuries to their employment capacity and reputation.

260.     The foregoing defamatory statements impute a want of integrity in the performance of Plaintiffs' business endeavors and skill, and prejudices Plaintiffs ability to do gain employment and/or otherwise do business.

261.     These injuries are so harmful that special damages are presumed.

262.     Defendants made the foregoing defamatory statements with knowledge of their falsity and with actual malice, so as to justify an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants:

    (a)    awarding Plaintiffs compensatory damages;

    (b)    ordering Defendants Allstate and Judy Greffin to pay punitive damages in the amount this Court deems just and appropriate;

    (c)    awarding Plaintiffs its costs and fees for bringing this action; and

(d)    awarding Plaintiffs such other relief as the Court deems just and

appropriate under these circumstances.

## COUNT III
## Tortious Interference with Prospective Economic Advantage
## (Against Judy Greffin)

263.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-

248 of its Complaint as if the same were fully set forth at length herein.

264.    Plaintiffs had a reasonable expectation of entering and continuing to enter

into a valid business relationship with Allstate based on its previous employment position

with Allstate.

265.    Defendant Judy Greffin knew of Plaintiffs reasonable expectancy, as

she was herself an employee of Allstate, and a superior to Plaintiffs.

266.    Defendant Judy Greffin unjustifiably and maliciously interfered,

preventing Plaintiffs' expectancy from ripening into a valid business relationship

and/or further business relationships by falsely accusing Plaintiffs of manipulating

the Pay for Performance plan, self-dealing, and directing the occurrence of portfolio

activity that would result in the maximization of their bonus compensation and work

performance calculation.

267.    Defendant Judy Greffin's interference was done willfully or with such

a gross negligence as to indicate a wanton disregard of the rights of others.

268.    Plaintiffs have sustained damages resulting from this malicious,

willful, or grossly negligent interference and those damages continue to mount.

WHEREFORE, Plaintiffs pray that the court enter a judgment in favor of

Plaintiff and against all Defendant Judy Griffin equal to the amount of damages

proven at a trial on the matter, and any and all further relief the Court deems fair and

just, including but not limited to expenses, and costs.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON THOSE COUNTS
BROUGHT AS MATTERS OF LAW**

Respectfully submitted,

Daniel Rivera, Stephen Kensinger, Deborah
Joy Meacock, and Rebecca Scheuneman


By:＿＿＿/s/ Robert D. Sweeney＿＿＿＿＿＿
One of their Attorneys

Robert D. Sweeney, Esq. (6238209)
Adam S. Miller, Esq. (6297199)
RDS Law
111 W. Washington Street
Suite 1160
Chicago, IL 60602
(312) 384-0500
(312) 384-0600 (FAX)