UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL RIVERA, STEPHEN KENSINGER, DEBORAH JOY MEACOCK, and REBECCA SCHEUNEMAN, | ) ) ) | 10 C 1733 |
| | ) | |
| Plaintiffs, | ) | Judge Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Daniel Rivera, Stephen Kensinger, Deborah Joy Meacock, and Rebecca Scheuneman brought this suit against their former employer, Allstate Insurance Company, and their supervisor, Judy Greffin, for violating the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, defamation, and tortious interference with prospective economic advantage. Doc. 1. On a Rule 12(b)(6) motion directed at the defamation and tortious interference claims, the court dismissed the tortious interference claim but allowed the defamation claim to proceed. Docs. 27-28 (Grady, J.) (reported at 2010 WL 4024873 (N.D. Ill. Oct. 13, 2010)). Plaintiffs then filed an amended complaint adding a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Doc. 29. Plaintiffs later voluntarily dismissed the ADEA claim, Docs. 68, 70, and all of their claims against Greffin, Doc. 46.

What remains are Plaintiffs' FCRA and defamation claims against Allstate. Allstate moved for summary judgment, Doc. 127, and after the motion was fully briefed, this case was reassigned to the undersigned judge, Doc. 162. With the parties' agreement, a jury trial has been set for January 11, 2016. Doc. 170. For the following reasons, Allstate's motion is granted as to

the defamation claim insofar as it relies on a *per se* theory, and is denied as to the defamation claim insofar as it relies on a *per quod* theory and as to the FCRA claim.

## Background

The following facts are stated as favorably to Plaintiffs, the non-movants, as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering Allstate's summary judgment motion, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Plaintiffs worked for Allstate in the company's Equity Division, which managed equity portfolios for Allstate's property and casualty insurance businesses and its pension plans. Rivera was the Equity Division's managing director and Meacock, Kensinger, and Scheuneman were members of the growth group, which traded individual securities on behalf of the pension plans. Rivera reported to Greffin, Allstate's Chief Investments Officer. Doc 150 at ¶¶ 4-10. Plaintiffs were salaried employees and eligible to receive bonus compensation under Allstate's "pay-for-performance" plan. *Id*. at ¶¶ 11-14.

Sometime in Spring 2009, Trond Odegaard, Allstate's Chief Risk Officer and the Investment Department's Compliance Officer, became concerned about trading practices in the Equity Division. He suggested to Greffin that Equity Division employees might be timing trades to inflate their bonuses. *Id*. at ¶¶ 30-32. Odegaard's suspicions focused on an algorithm called the "Dietz method," which was used to estimate portfolio returns and calculate Plaintiffs' performance bonuses. The Dietz method is an approximation; it assumes that all cash flows into and out of the portfolio take place at the same time each day, and thus can overstate or understate a portfolio's true performance by a small amount. The error term, called the "Dietz effect," can be either positive or negative. *Id*. at ¶¶ 15-19. Theoretically, therefore, a trader with knowledge

of the algorithm could time trades so as to make the Dietz estimate look better than the portfolio's true return and thereby inflate her bonus calculation.

After further work by Odegaard, Allstate decided to retain an outside law firm, Steptoe & Johnson, to investigate the allegations. *Id*. at ¶ 37. Steptoe engaged an economic consulting firm, NERA, to review trading data to determine the possible impact of timed trading on the portfolios. In addition, Steptoe lawyers reviewed Equity Division emails and trading data and interviewed Allstate employees, including Plaintiffs, about their understanding of the Dietz method, their trading processes, and Allstate's method for calculating bonuses. *Id*. at ¶¶ 37-47.

Around the time of Steptoe's investigation, Greffin informed the Equity Division that Allstate had decided to outsource to Goldman Sachs most of its equity portfolio management. Due to the outsourcing decision, all Equity Division employees, except for the group responsible for trading convertible bonds, would be disbanded. *Id*. at ¶¶ 23-25. On December 3, 2009, Human Resources Director Brett Winchell informed Plaintiffs that they were being terminated for cause for violating Allstate's ethics code. Because Plaintiffs were terminated for cause, they did not receive severance pay. *Id*. at ¶¶ 56-57, 59-65. The terminations took effect the following day. *Id*. at ¶ 66.

In February 2010, Allstate filed its annual Form 10-K with the Securities and Exchange Commission. The 10-K disclosed that Allstate had conducted an investigation into alleged trading improprieties and paid $91 million into the company's pension plans to cover the potential adverse impact. The 10-K stated, in relevant part:

> In 2009, we became aware of allegations that some employees responsible for trading equity securities in certain portfolios of two AIC [Allstate Insurance Company] defined benefit pension plans and certain portfolios of AIC and an AIC subsidiary may have timed the execution of certain trades in order to enhance their individual performance under incentive compensation plans,

without regard to whether such timing adversely impacted the actual investment performance of the portfolios.

We retained outside counsel, who in turn engaged an independent economic consulting firm to conduct a review and assist us in understanding the facts surrounding, and the potential implications of, the alleged timing of these trades for the period from June 2003 to May 2009. The consulting firm reported that it was unable to determine from our records the precise amounts by which portfolio performance might have been adversely impacted during that period. Accordingly, the economic consultant applied economic modeling techniques and assumptions reasonably designed to estimate the potential adverse impact on the pension plans and the company accounts, taking into account, among other things, the distinctions between the pension plans and the company portfolios.

Based on their work, the economic consultants estimated that the performance of the pension plans' portfolios could have been adversely impacted by approximately $91 million (including interest) and that the performance of the company portfolio could have been adversely impacted by approximately $116 million (including interest) in the aggregate over the six-year period under review. We believe that our financial statements and those for the pension plans properly reflected the portfolios' actual investment performance results during the entire period that was reviewed.

In December 2009, based on the economic consultant's modeled estimates, we paid an aggregate of $91 million into the two defined benefit pension plans. These payments had no material impact on our reported earnings or shareholders' equity, but reduced our assets, operating cash flows, and unfunded pension liability to the plans. At December 31, 2009, our total assets, operating cash flows and shareholders' equity were $132.65 billion, $4.30 billion and $16.69 billion, respectively. At all times during this period, the plans were adequately funded pursuant to applicable regulatory and actuarial requirements. As a result of these additional funds in the plans, our future contributions to the plans, based on actuarial analysis, may be reduced. Using the economic consultant's calculation of the potential adverse impact on the portfolios, we currently estimate that the additional compensation paid to all the employees working in the affected group was approximately $1.2 million over the six-year period as a result of these activities. In late 2009, we retained an independent investment firm to conduct portfolio management and trading activity for the specific portfolios impacted by these activities. We have reported this matter to the U.S. Department of Labor and the U.S. Securities and Exchange Commission and have advised both agencies that we will respond to any questions they might have.

*Id*. at ¶¶ 71-72.

The same day that Allstate filed its 10-K, Greffin sent a memorandum (the "Greffin Memorandum") to the Investment Department.  It read:

> Allstate released its annual financial report on Form 10-K today.  Within that filing, we disclosed details around allegations regarding trading practices within our equity portfolios that came to light in the past year.  We took this matter very seriously and launched an investigation as soon as we became aware of the allegations.
>
> Outside counsel was retained to assist us in understanding the facts surrounding, and the potential implications of, these activities.  As part of their analysis, an independent economic consulting firm was retained to estimate the potential adverse impact to the performance of our portfolios.  The consultant determined that the performance on some of our portfolios, as well as our two pension plan portfolios, could have been adversely impacted by the activities.  As a result, Allstate made a contribution to the pension plans during the 4th quarter which is disclosed in the 10-K.
>
> We believe that our financial statements and those of the pension plans properly reflected the portfolios' actual investment performance and the pension plans were adequately funded during this entire period.  This matter did not affect the plans' ability to continue to provide benefits to plan participants.
>
> Situations like this can be unsettling and can reflect poorly on our organization.  However, I believe organizations are also defined by how they respond to events like this.  We were transparent in reporting this matter to the U.S. Department of Labor and the S.E.C., and disclosed it [to] our investors.  We're taking steps to improve our governance, compliance practices and training.
>
> We remain committed to the highest levels of ethics and integrity in the stewardship of Allstate's assets.

*Id*. at ¶¶ 67-68.  Additional facts are set forth below.

## Discussion

## I.    The Defamation Claim

To prove defamation under Illinois law, a plaintiff "must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green*

*v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009); *see also Republic Tobacco Co. v N. Atl. Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004). Illinois recognizes two types of defamation claims: *per quod* and *per se*. *See Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). In a *per quod* action, the plaintiff must plead and prove actual damages. *Ibid.*; *Republic Tobacco*, 381 F.3d at 726. In a *per se* action, the statement's defamatory character is considered so "obvious and apparent on its face" that "injury to the plaintiff's reputation may be presumed." *Tuite*, 866 N.E.2d at 121. Five categories of statements are defamatory *per se*, including statements that "impute an inability to perform or a want of integrity in the discharge of duties of office or employment." *Republic Tobacco*, 381 F.3d at 726. Plaintiffs' defamation claim alleges that Allstate made statements that they had timed trades to maximize their bonuses, used the Dietz calculation to increase their work performance measurements, and violated Allstate's ethics code. Doc. 29 at ¶¶ 245-252, 259-266.

Allstate contends that Plaintiffs are improperly "attempt[ing] to base their claims" on statements—the Form 10-K and the Greffin Memorandum—not mentioned in the operative complaint. Doc. 128 at 3. Plaintiffs' response brief admits that "[t]he defamatory statements in this case are contained in … Allstate's February 10-K and the Greff[i]n Memorandum." Doc. 149 at 4. In addition, the amended complaint does not specifically mention the 10-K or the Greffin Memorandum. Thus, if Allstate were correct that a plaintiff can base a defamation claim only on statements specifically pleaded in the complaint, summary judgment would be proper.

But Allstate is wrong. Greffin's brief at the Rule 12(b)(6) stage, which Allstate adopted, Doc. 19 at 1, moved to dismiss the original complaint's defamation claim because it did not specifically identify the allegedly defamatory statements. Doc. 17 at 4-7. The court rejected the argument, holding that "'a plaintiff need not allege the defamatory language verbatim,'" that

"[t]he complaint adequately apprises defendants of the substance of the allegedly defamatory statements," and that "[f]urther details can be developed in discovery." 2010 WL 4024873, at *3 (quoting *Emery v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2003 WL 22176077, at *7 (N.D. Ill. Sept. 18, 2003)). That holding was and remains correct. Although Allstate seeks support in state court cases applying Illinois procedural rules, a plaintiff bringing a defamation claim in federal court "is entitled to the usual rules for notice pleading established by Rule 8," *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 926 (7th Cir. 2003), and Rule 8 does not require that the complaint recite verbatim the allegedly defamatory statement. *See Wuchenich v. Shenandoah Mem'l Hosp.*, 2000 WL 665633, at *14 (4th Cir. May 22, 2000) (citable pursuant to 4th Cir. R. 32.1) (citing Rule 8 for the proposition that a defamation plaintiff need not plead "the exact words allegedly defaming plaintiff, or the precise occasions on which those statements were made, or to whom they were made") (internal quotation marks omitted); *Blocker v. Cmty. Educ. Ctrs., Inc.*, 2014 WL 1348959, at *7 (E.D. Pa. Apr. 7, 2014) ("Under Federal Rule of Civil Procedure 8(a), a defamation plaintiff does not have to plead the precise defamatory statements, nor must she specifically name the person who made the statements …."); *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1027 (D. Nev. 2013) (rejecting the defendant's argument that a defamation complaint must "list the precise statements alleged to be false and defamatory, who made them, and when") (internal quotation marks omitted); *Cristelli v. Filomena II, Inc.*, 1999 WL 1081290, at *3 (D.N.J. Dec. 1, 1999) ("According to Rule 8, a defamation pleading does not need to cite precise defamatory statements, it must only provide sufficient notice to the other party of the allegations made against him."); *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1284 (N.D. Ill. 1996) ("defamatory language need not be quoted verbatim"). Given this, it

cannot be that a defamation plaintiff at summary judgment or trial is limited to the allegedly defamatory statements recited in the complaint.

This is particularly true in this case because Allstate has known from the outset that Plaintiffs believed that the 10-K and Greffin Memorandum had defamed them. Greffin's initial Rule 12(b)(6) brief quoted the relevant portion of Allstate's 10-K, Doc. 17 at 3-4, and even attached the 10-K as an exhibit, Doc. 17-2; Plaintiffs' response brief argued that the 10-K's statements about Plaintiffs were false and defamatory, Doc. 22 at 2, 8-9; and Greffin's reply brief, which Allstate also adopted, Doc. 26 at 1, argued that the 10-K's statements about Plaintiffs were true, Doc. 25 at 5-7. Allstate cannot plausibly contend that the amended complaint left it unaware of the basis for Plaintiffs' defamation claim—it knew the 10-K was on the table, and the Greffin Memorandum simply incorporated what the 10-K had said about Plaintiffs.

Allstate next argues that the defamation claim fails—at least as to the *per se* theory— because neither the 10-K nor the Greffin Memorandum mention Plaintiffs by name, and "a statement that does not mention a plaintiff by name is not defamatory per se." Doc. 128 at 6. In support, Allstate cites *Barry Harlem Corp. v. Kraff*, 652 N.E.2d 1077 (Ill. App. 1995), where the Appellate Court of Illinois held that "[a] statement which does not mention the plaintiff by name cannot be injurious to him or her on its face." *Id*. at 1080. Illinois law on this point is muddled, as other Illinois decisions have suggested "that there is no automatic ban on recovery if the plaintiff is not named, as *Barry Harlem* … held." *Muzikowski*, 322 F.3d at 925 (citing cases). Moreover, the year after *Barry Harlem* was decided, the Supreme Court of Illinois held that "where a libelous article does not name the plaintiff, it should appear on the face of the complaint that persons other than the plaintiff and the defendant must have reasonably

understood that the article was about the plaintiff and that the allegedly libelous expression related to her." *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1218 (Ill. 1996) (emphasis omitted). The Seventh Circuit has accordingly interpreted Illinois cases about whether the allegedly defamatory statement must directly name the plaintiff as having imposed only a state law pleading standard, not a substantive state law principle that federal courts must apply. *See Muzikowski*, 322 F.3d at 925-26 (interpreting *Barry Harlem* as "impos[ing] a heightened pleading standard for complaints basing claims on publication that do not literally name the plaintiff," and noting that "the Illinois pleading rule … of course does not apply in a federal court"). It follows that a federal plaintiff can proceed with a *per se* defamation claim based on a statement that does not directly name her if she can identify enough "similarities" that "a reasonable person in the community [could] believe that [the statement] was intended to … refer to [her]." *Id*. at 926.

Plaintiffs argue that several contextual factors identify them as the subjects of the 10-K's statement, including their membership in the Equity Division, the fact that their portfolios were among those transferred to Goldman Sachs, and the fact that, unlike other members of the Equity Division, their phones and email were disconnected on December 4, 2009 instead of at the end of the month. Doc. 149 at 6-7. Given these clues, Plaintiffs argue, it would have been "immediately evident to anyone in Plaintiffs' industry that [the 10-K] was about them." *Id*. at 6. As factual support for this argument, Plaintiffs cite paragraphs of their Local Rule 56.1(b)(3)(C) statement that rely exclusively on declarations executed by Scheuneman and Rivera. *Id*. at 6-7 (citing Doc. 151 at ¶¶ 14-26).

Plaintiffs' argument runs into an evidentiary obstacle. It is true that 28 U.S.C. § 1746 allows a party to rely on her own unsworn declaration to provide the factual predicate for

opposing a summary judgment motion.  However, § 1746 states that an unsworn declaration may be used only if it is "subscribed by [the declarant], as true under penalty of perjury, and dated, in substantially the following form: … "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).  (Signature)."  28 U.S.C. § 1746(2); *see also* Fed. R. Civ. P. 56(c) 2010 advisory committee notes ("28 U.S.C. § 1746 allows a written unsworn declaration … subscribed in proper form as true under penalty of perjury to substitute for an affidavit.").  Allstate argues that the Rivera and Scheuneman declarations are not dated, and adds that the declarations' purported signature pages are exact facsimiles of Rivera's and Scheuneman's earlier interrogatory verifications.  Doc. 160 at 3-4; Doc. 161 at ¶¶ 14-26.  Allstate's observations about the declarations are correct.  Doc. 151-5 at 4, 8; Doc. 161-1 at 4-5.  And despite the court's inviting them to do so during the first status conference following the case's reassignment to the undersigned judge, Plaintiffs never sought leave to submit amended declarations.  Doc. 165.

The consequence of the Rivera and Scheuneman declarations being undated and unsigned—the signatures were recycled from their earlier interrogatory responses, appearing on the page following each declaration, meaning that the declarations themselves are unsigned—is that the declarations are not evidence and thus will be disregarded on summary judgment.  *See Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014) (noting that a statement "might pass muster as a declaration, which can be substituted for an affidavit and thus constitute part of the evidentiary record, *provided* it complies with the formalities required by 28 U.S.C. § 1746") (emphasis added); *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 540 & n.5 (7th Cir. 2011) (holding that the district court properly disregarded written statements that "failed to comply with the requirements of Rule 56(e) and 28 U.S.C. § 1746" in that they

were "not signed, dated, or notarized"); *Sellers v. Henman*, 41 F.3d 1100, 1101 (7th Cir. 1994)

("One of the defendants' key affidavits was unsigned and hence unsworn, and therefore did not

comply with Rule 56(e)."); *Counts v. Karton Polymers U.S., LLC*, 260 F. App'x 825, 829 (6th

Cir. 2008) ("the applicable statute requires that unsworn declarations be dated … [and t]hus,

striking the declarations was not an abuse of discretion").  As a result, Plaintiffs have no

admissible evidence to support their position, essential to their *per se* theory, that a reasonable

person in their community would have understood the 10-K and Greffin Memorandum to refer to

them.[*]  It follows that summary judgment on the defamation claim is appropriate to the extent it

rests on a *per se* theory.  Given this disposition, there is no need to address Allstate's innocent

construction defense, which applies only to *per se* claims.  *See Republic Tobacco*, 381 F.3d at

726 ("Under the Illinois innocent construction rule, even a statement that falls into one of the

limited *per se* categories will not be found defamatory *per se* if it is reasonably capable of an

innocent construction.") (internal quotation marks omitted); *Tuite*, 866 N.E.2d at 127 ("A

plaintiff can always avoid application of the innocent construction rule by seeking to establish a

*per quod* action.").

    That leaves defamation *per quod*.  Allstate argues that the claim fails because its

statements about Plaintiffs are true.  Doc. 128 at 6-8.  Truth is an absolute defense to a

defamation action.  *See Republic Tobacco*, 381 F.3d at 727; *Haynes v. Alfred A. Knopf, Inc.*, 8

---

[*]  The relevant portion of Plaintiffs' opposition brief also cites ¶¶ 12-13 of their Local Rule
56.1(b)(3)(C) statement, which do not suffer from the same evidentiary flaws.  But those
paragraphs do not come close to conveying that *Plaintiffs* were the members of the equity group
referenced in the 10-K and Greffin Memorandum.  Doc. 151 at ¶¶ 12-13 ("Plaintiffs were
members of the equity division in the time period discussed in the Allstate February 10-K for
computation of unearned bonuses, June 2003 – May 2009, and the division was led by three
different directors during that time, the last of which was Plaintiff Rivera," and "The Allstate
February 10-K identifies the individuals accused of timing trades as: 'employees responsible for
trading equity securities in certain portfolios of two AIC defined benefit pension plans and
certain portfolios of AIC and an AIC subsidiary'") (emphasis omitted).

F.3d 1222, 1227-28 (7th Cir. 1993); *Seitz-Partridge v. Loyola Univ. of Chi.*, 987 N.E.2d 34, 41 (Ill. App. 2013); Restatement (Second) of Torts § 581A cmt. a (1977) ("There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose and inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him."). And the allegedly defamatory statement need not be literally true in all respects—it is enough if it is "substantially true," which is to say that a statement is actionable only if it made "the plaintiff significantly worse off than a completely or literally truthful publication would have." *Pope v. Chronicle Publ'g Co.*, 95 F.3d 607, 613 (7th Cir. 1996); *see also Seitz-Partridge*, 987 N.E.2d at 41. "To establish the defense of substantial truth, the defendant need only show the truth of the 'gist' or 'sting' of the defamatory material." *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 982 (7th Cir. 2004).

The 10-K states that Allstate investigated allegations of trade timing by equity traders; that Allstate's investigation showed a potential adverse impact on the pension funds of $91 million and potential excess bonus compensation of $1.2 million; that Allstate made a $91 million payment to the pension plans based on those estimates; and that management of the portfolios was transferred to an outside firm. Plaintiffs argue that Allstate knew the $91 million potential adverse impact figure and $1.2 million excess bonus compensation figure were false but published them anyway. "For whatever reason," Plaintiffs say, "Allstate wanted to move [$91 million] from its shareholders to its Pension Plans … and it used the Plaintiffs as scapegoats to accomplish it." Doc. 149 at 9.

In support, Plaintiffs point to a memorandum that Steptoe sent to the U.S. Department of Labor on January 29, 2010, describing its investigation into alleged Dietz motivated trading (the "Steptoe Memorandum"). Doc. 151-3; Doc. 161 at ¶ 35. The memorandum states that Steptoe

uncovered in the Equity Division's email records several dozen instances of what seemed like Dietz-motivated trading, and that "[b]ecause [Allstate] had no evidence that the e-mails captured all trading instructions, [Allstate] decided to look at all the trades over the period using a 'but for' analysis." Doc. 151-3 at 10. This analysis showed the "potential economic damage" to the pension plans was approximately $91 million. *Id*. at 13. The memorandum went on to acknowledge that "[w]e believe that this amount, which assumes that nearly every trade was inappropriately delayed, overstates any actual economic disadvantage suffered by the plans for several reasons"—for example, the $91 million figure assumed that all end-of-day trading was Dietz-motivated, and it did not net out days where Dietz-motivated trading would have benefitted the portfolios against days where timed trading would have hurt them. *Id*. at 13-14.

To show the falsity of the $1.2 million enhanced bonus estimate, Plaintiffs point to a letter that Allstate Deputy General Counsel Mary McGinn sent to the Department of Labor on October 14, 2010 (the "McGinn Letter"). Doc. 151-4; Doc. 161 at ¶ 36. The Department had asked Allstate about the Steptoe Memorandum's assertion that "Allstate, taking into account returns recalculated by NERA, estimated the impact of this trading to the 25 employees who were in the equity group for some or all of 2003 through 2008 as … approximately $1.2 million." Doc. 151-3 at 3 n.1. McGinn responded:

> The footnote was intended to roughly approximate the potential increase in bonuses, if we assumed the algorithm used by NERA Economic Consulting reflected actual trading activity. As we explained, the NERA algorithm was a way for counsel and Allstate to estimate a possible maximum impact of any potential "Dietz" motivated equity trading. No one believed, then or now, that this was an accurate description of the activity on the equity desk, nor that any actual impact on the portfolios was anywhere near the result produced by using the NERA algorithm. Just as we wanted to see a possible maximum portfolio impact, we wanted to estimate the corresponding impact on bonuses. If one looked only at the actual e-mails that arguably could demonstrate bad motivation, there would have been virtually no effect on bonuses.

Doc. 151-4 at 2.

Plaintiffs focus on certain admissions in the Steptoe Memorandum and McGinn Letter—"[w]e believe that this amount … overstates any actual economic disadvantage"; "[n]o one believed, then or now, that this was an accurate description"; "[i]f one looked only at the actual e-mails that arguably could demonstrate bad motivation, there would have been virtually no effect on bonuses"—to show that Allstate knew that the 10-K was false. Allstate takes a different view, arguing that the Steptoe Memorandum and McGinn Letter show that because Allstate was *unsure* whether the emails reflected the totality of Dietz-motivated trading, it instructed NERA to calculate the maximum potential impact that such trading could have had on the pension plans. Doc. 151-3 at 3 ("Because Allstate was not confident that the practice was isolated to the transactions reflected in these relatively few e-mails, it determined to use an algorithm developed with the help of Steptoe & Johnson and NERA to estimate *potential disadvantage* to the plans.") (emphasis added); Doc. 151-4 at 3 (stating that the potential losses were calculated by "NERA, using an algorithm it developed to help identify all trades that *potentially might have been* delayed due to the influence of the 'Dietz' factor … and assuming, for the sake of estimating the *possible maximum impact*, that all such identified trades were in fact delayed") (emphasis added). This, Allstate maintains, is precisely what the 10-K said:

- "[NERA] was unable to determine from [Allstate's] records the *precise amounts* by which portfolio performance might have been adversely impacted during [the] period."

- "Accordingly, [NERA] applied economic modeling techniques and assumptions reasonably designed to estimate the *potential adverse impact* on the pension plans and company accounts."

- "[T]he economic consultants estimated that the performance of the pension plans' portfolios *could have been adversely impacted* by approximately $91 million."

- *"Using the economic consultant's calculation* of the *potential adverse impact* on the portfolios, we currently estimate that the additional

> compensation paid to all the employees working in the affected group was
> approximately $1.2 million."

Doc. 150 at ¶ 72 (emphasis added). So, Allstate concludes, even if Plaintiffs are right that its

assumptions caused it to overstate the actual loss amounts and bonus enhancements, Allstate *did*

make those assumptions, and the 10-K (and thus the Greffin Memorandum) accurately stated that

the estimates were the result of "modeling techniques and assumptions" made by NERA.

Allstate's submission fails at the summary judgment stage, where the record must be

viewed in the light most favorable to Plaintiffs. The excess bonus compensation could have been

$1.2 million, but it also could have been $0. Given this, a reasonable jury could find that

Allstate's public announcement of an estimated bonus enhancement figure of $1.2 million,

without revealing the extent of its doubts or actually describing the assumptions underlying the

estimate, was not substantially true. *See Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir.

2015) ("Where a publication implies something false and defamatory by omitting or strategically

juxtaposing key facts, the publication may be actionable even though all of the individual

statements are literally true when considered in isolation."); *Turner v. KTRK Television, Inc.*, 38

S.W.3d 103, 115 (Tex. 2000) (holding "that a plaintiff can bring a claim for defamation when

discrete facts, literally or substantially true, are published in such a way that they create a

substantially false and defamatory impression by omitting material facts or juxtaposing facts in a

misleading way"); *Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383,

392 (8th Cir. 1996) (holding that Minnesota law "would recognize a cause of action for implied

defamation where a defendant omits important facts or where the defendant juxtaposes a series

of facts so as to imply a defamatory connection between them"); D. Dobbs, The Law of Torts

§ 566 (2d ed.) ("[I]f the defendant had reason to believe the implication [was] false … liability is

appropriate if he omits to report the exculpating facts that he knew or should have known.");

*ibid*. ("Evidence that the defendant acted intentionally or negligently to create a false implication might be found in the intentional or negligent omission of material facts which create a misleading impression, or in artificial juxtaposition of truthful facts to give undue weight to negative inference."). The same holds for the $91 million portfolio loss figure.

This result is not undermined by *Global Relief Foundation*. In that case, the Global Relief Foundation ("GRF") sued news organizations for reporting that it was being investigated by the United States government for funding terrorists. 390 F.3d at 974-75. In pressing its claim, GRF contended that the defendants "should be required to demonstrate not only that they accurately reported the government's suspicions but that GRF was actually guilty of the conduct for which the government was investigating the group." *Id*. at 980. The Seventh Circuit rejected the argument, holding that it did not matter whether GRF had in fact provided funding to terrorist groups, given that the "fact of the investigation was true," which was "all that the defendants need to show for the defense of substantial truth." *Id*. at 987-89. Here, by contrast, Plaintiffs are not suing a news organization for reporting on Allstate's investigation; rather, the entity that conducted the investigation (Allstate) also is the entity that reported its results, and a reasonable jury could find that the results were knowingly and intentionally overblown. It would be perverse if an employer could escape liability for falsely smearing its employees simply by couching the smear as a report on the results of an investigation that the employer designed to smear the employees.

Finally, Allstate seeks refuge in the conditional privilege that Illinois law grants to certain communications. Illinois recognizes three categories of privilege: "(1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or of some other third person is

involved; (3) situations in which a recognized interest of the public is concerned." *Kuwik v. Starmark Star Mktg. and Admin., Inc.*, 619 N.E.2d 129, 135 (Ill. 1993). Once the defendant shows that the allegedly defamatory statement fits within one of these categories, the plaintiff can overcome the privilege by proving abuse of the privilege:

> [T]o prove an abuse of the qualified privilege, the plaintiff must show a direct intention to injure another, or … a reckless disregard of [the defamed party's] rights and of the consequences that may result to him. Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.

*Id*. at 135-36 (citations and internal quotation marks omitted).

In *Kuwik*, the plaintiff chiropractor performed tests on his patient, and when the insurance company refused to cover the tests, the plaintiff complained to the Illinois Department of Insurance, which investigated. The insurer then sent a letter to the Department explaining that it would not cover the tests because they were "outside the scope and knowledge as well as the license of the provider." *Id*. at 131-32. The insurer's statement was incorrect, as chiropractors at that time were restricted only from prescribing drugs and performing surgery. Invoking the abuse of privilege doctrine, the Supreme Court of Illinois held that summary judgment for the defendants was improper because "a question of fact exists as to whether defendants displayed a reckless disregard for plaintiff's rights in not conducting a proper investigation into the truth of their statements concerning plaintiff's knowledge and licensing." *Id*. at 136

The same result obtains here. Even if Allstate's statements about Plaintiffs fall within any of the three categories of privilege, the record would allow a reasonable jury to find that Allstate's investigation was reckless, if not intentionally fallacious. *See Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 536 (7th Cir. 2009) ("[G]enuine issues of

material fact exist as to whether CIBC knew of or had reason to suspect the forgery, which indicate that CIBC's behavior in sending the letters to EDC may have been in reckless disregard of Giant Screen's rights."); *Stavros v. Marrese*, 753 N.E.2d 1013, 1019-20 (Ill. App. 2001) (holding that a letter sent to the plaintiff's employer accusing the plaintiff of extortion abused the privilege because the "defendant knew extortion was a crime," and a reasonable jury could conclude that "defendant should have investigated more carefully … the definition of extortion, to determine whether plaintiff's behavior in fact amounted to this criminal behavior"). Moreover, Greffin, Allstate's Chief Investment Officer, testified that she "was surprised with the level of detail that was included in the 10-K." Doc. 161 at ¶ 32. Given this, reasonable jury could find that the 10-K was not sufficiently limited in scope to benefit from the privilege. *See Mobile Weather Team, Inc. v. Quinn*, 2006 WL 2598318, at *1 (C.D. Ill. Sept. 8, 2006) (submitting the abuse of privilege issue to a jury where "the record present[ed] serious questions of fact as to whether [the defendant] … went beyond the legitimate scope of protecting his interest").

## II.    The FCRA Claim

Section 1681b(b)(2) of the FCRA states, with certain exceptions not relevant here, that an employer must provide notice and obtain permission from an employee before procuring certain third-party investigative reports. *See* 15 U.S.C. § 1681b(b)(2)(A) ("a person may not procure a consumer report … for employment purposes with respect to any consumer, unless (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured … and (ii) the consumer has authorized in writing … the procurement of the report by that person"). Section 1681a(d)(2)(D) excludes from the FCRA's definition of "consumer report," and thus from § 1681b(b)(2)'s notice-and-permission requirement, "a communication described in subsection (o) or (x) [sic] of this section." 15 U.S.C. § 1681a(d)(2)(D). The

reference in § 1681a(d)(2)(D) to "subsection (x)" is a typo; it should be "subsection (y)." The source of the error is the Dodd-Frank Act of 2010, which re-designated former subsection (x) of § 1681a as subsection (y) but neglected to update the cross-reference in subsection (d). *See* Pub. L. No. 111-203, § 1088(a)(1)(A), 124 Stat. 1376, 2086.

Section 1681a(y), enacted as part of the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), Pub. L. No. 108-159, § 611, 117 Stat. 1952, 2010, reads in relevant part:

**(1) Communications described in this subsection**

A communication is described in this subsection if–

> **(A)** but for subsection (d)(2)(D) of this section, the communication would be a consumer report;

> **(B)** the communication is made to an employer in connection with an investigation of--

>> **(i)** suspected misconduct relating to employment; or

>> **(ii)** compliance with Federal, State, or local laws and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer;

> **(C)** the communication is not made for the purpose of investigating a consumer's credit worthiness, credit standing, or credit capacity; and

> **(D)** the communication is not provided to any person except–

>> **(i)** to the employer or an agent of the employer;

>> **(ii)** to any Federal or State officer, agency, or department, or any officer, agency, or department of a unit of general local government;

>> **(iii)** to any self-regulatory organization with regulatory authority over the activities of the employer or employee;

>> **(iv)** as otherwise required by law; or

>> **(v)** pursuant to section 1681f of this title.

### (2) Subsequent disclosure

After taking any adverse action based in whole or in part on a communication described in paragraph (1), *the employer shall disclose to the consumer a summary containing the nature and substance of the communication upon which the adverse action is based*, except that the sources of information acquired solely for use in preparing what would be but for subsection (d)(2)(D) of this section an investigative consumer report need not be disclosed.

15 U.S.C. § 1681a(y) (emphasis added).  There are two facets to analysis under § 1681a(y).  The first is whether the employer took an adverse action against the plaintiff based on a communication described in subsection (y)(1).  Allstate does not dispute that Steptoe's investigation resulted in a qualifying communication to Allstate about the investigation and an adverse action against Plaintiffs.  The second is whether the employer provided the plaintiff with a "summary containing the nature and substance" of the communication that formed the basis for the adverse action.  The parties dispute this issue—that is, whether Allstate, after terminating Plaintiffs, provided them with a summary of Steptoe's communication to Allstate regarding the investigation.  If Allstate did not provide the summary, then the § 1681a(y) exception does not apply and Plaintiffs can proceed on their § 1681b(b)(2) claim.

Allstate asserts that Winchell, the Human Resources Director, provided the requisite summary to Plaintiffs when he informed them that they would be terminated for cause.  Doc. 128 at 14.  Allstate maintains that Winchell "followed a prepared script and informed Plaintiffs that, as a result of Allstate's investigation regarding the pay-for-performance and Dietz issues, they would be terminated for cause and without severance because it was believed they had violated Allstate's conflict of interest policy.  Thus, each Plaintiff was told their termination for cause was for violating the conflict of interest policy as a result of an investigation into trading practices."  *Id*. at 14-15.  Plaintiffs disagree, asserting that "whether Allstate gave a summary of

any fashion … is in contention," and that "[e]ven in the event that Allstate provided some form of summary, the term 'summary' is not defined in the FCRA."  Doc. 149 at 15.

Plaintiffs have the better of the argument on summary judgment, when all genuine factual disputes must be resolved in their favor.  Rivera testified that Winchell "gave me a very nebulous and vague comment with no specifics and no evidence," and that another participant at the meeting told him "several times that all they're going to say is a violation of the conflict of interest and code of ethics [policies] and that there would be no report and … a whole host of other reasons why we wouldn't see a report."  Doc. 130-2 at 14-15.  Kensinger testified that Winchell told her, "'You're being dismissed for cause,' or something along that line.  And I asked him, 'For what?'  And, he wouldn't tell me. … I said, 'What trades?  When?'  And he just – he wouldn't tell me."  Doc. 130-3 at 17 (edited for clarity).  Winchell did not tell Meacock and Scheuneman any specifics about their terminations.  Doc. 130-4 at 16 (Meacock: "My response to that was, … What action did I take in a conflict of interest.  He said, We have decided you've acted with a conflict of interest. … And that probably happened six times."); Doc. 130-5 at 16 (Scheuneman: "They said that [I] violat[ed] the conflict of interest provision, but that's all he would say.  And I … might have asked for specifics. … And then he said that was all he was going to tell me.").  Scheuneman's handwritten notes of her telephone call with Winchell, the only contemporaneous written account of the interviews in the record, do not mention the Steptoe investigation.  Doc. 130-25 at 2.

Thus, although Allstate maintains that Winchell followed a prepared script and told Plaintiffs that they were being terminated as a result of the Steptoe investigation, it does not appear that way when the record is viewed in the light most favorable to Plaintiffs.  When the record is viewed through that lens, Winchell never actually told Plaintiffs they were being

terminated as a result of the investigation; rather, he told them that they were being dismissed for violating Allstate's conflict of interest policy, and when pressed for details, he refused to give any. Scheuneman's notes do indicate that she "asked for restated #s," which she later testified was a reference to the Dietz method. *Ibid.*; Doc. 130-5 at 17. But all this shows is that Scheuneman knew that her termination involved the Dietz method in some way. It does not show that Winchell told her that she was being fired as a result of the outside investigation.

Nor would disclosing the bare fact that Plaintiffs were being terminated "as a result of" the Steptoe investigation have satisfied Allstate's obligations under the FCRA. Remember that § 1681a(y)(2) requires the employer to disclose a "summary containing the nature and substance of the *communication* upon which the adverse action is based"—here, what Steptoe told Allstate about the results of its investigation. Allstate's argument that "all the Plaintiffs were interviewed during the investigation, and knew it pertained to use of Dietz and to trading practices and understood that they were terminated for cause as a result of the investigation," Doc. 128 at 15, is therefore beside the point. It does not matter that Plaintiffs learned, before any adverse action was taken, that they were being interviewed as part of an outside investigation involving the Dietz method. The FCRA required that Plaintiffs receive, *after* the adverse action, at least a summary of what the investigation has concluded.

The FCRA does not define the term "summary," and there is virtually no case law on the point. The only opinion mentioning the summary disclosure requirement in an arguably substantive way appears to be *Pearce v. Oral & Maxillofacial Associates LLC*, 2010 WL 5253595 (W.D. Okla. Dec. 16, 2010), a constructive discharge case where the plaintiff also claimed that her employer had failed to provide her with a copy of a third-party report it had commissioned about her. The court concluded that "while plaintiff's allegation as to a demand

for a copy of the report goes further than the law contemplates …, and plaintiff apparently got some information from her employer, the court concludes a sufficient basis has been alleged as to the claim for non-provision of a summary." *Id*. at *4 n.8.  Months later, the court dismissed claims under the Oklahoma Credit Services Organization Act as preempted by the FCRA's "summary" requirement, but it did not say anything more about what the FCRA disclosure had to include.  *See Pearce v. Oral & Maxillofacial Assocs. LLC*, 2011 WL 1325597, at *3-4 (W.D. Okla. Apr. 6, 2011).

The parties' briefs shed little light on the subject.  Even after Plaintiffs raised the issue in their opposition brief, Allstate did not offer a definition of "summary," but simply reasserted that "the undisputed evidence establishes that Plaintiffs were provided with the requisite summary under [the] FCRA."  Doc. 160 at 15.  Plaintiffs do not offer a definition either, and nor do they suggest what information Allstate had to convey to comply with § 1681a(y).

Nevertheless, it is hard to see how Winchell's explanation that Plaintiffs were being terminated for violating the conflict of interest policy—or even for violating the policy as revealed by the Steptoe investigation—could constitute a "summary of the nature and substance of the communication upon which the adverse action is based."  By way of analogy, consider the Seventh Circuit's construction of what is now Federal Rule of Criminal Procedure 16(a)(1)(G), which "requires the government to provide, at [the] defendant's request, a written summary of the expert testimony that it intends to use during its case-in-chief."  *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001).  "The Rule," the Seventh Circuit held, "requires a summary of the expected testimony, not a list of topics."  *Ibid*.  Similarly, Federal Rule of Civil Procedure 26(a)(2)(C)'s requirement that an expert disclose "a summary of the facts and opinions to which the witness is expected to testify" is not satisfied by a "mere statement of the topics of the

opinions" or "the topic matters of facts relied upon." *Little Hocking Water Ass'n, Inc. v. E.I.*

*DuPont de Nemours & Co.*, 2015 WL 1105840, at *9 (S.D. Ohio Mar. 11, 2015); *cf. Anderson v.*

*Bristol, Inc.*, 936 F. Supp. 2d 1039, 1059 (S.D. Iowa 2013) ("A summary is defined as a brief

account that states the main points of a larger body of information."); *Nicastle v. Adams Cnty.*

*Sheriff's Office*, 2011 WL 1674954, at *1 (D. Colo. May 3, 2011) (same).

Viewing the record in the light most favorable to Plaintiffs, Allstate at most has shown

that Plaintiffs were aware of the "topics" of the Steptoe investigation (the Dietz method, trade

timing, and code of ethics violations) and that the investigation had something to do with their

terminations. Whatever a "summary containing the nature and substance of the communication"

means, it must require more than that. Allstate had to relay the "main points" of the

investigation's methods and conclusions. The specifics of Winchell's conversations with

Plaintiffs are still in dispute, and it may turn out that Allstate did provide sufficient disclosure.

At the summary judgment stage, however, the court cannot say there is no genuine issue of

material fact on the point.

### Conclusion

For the foregoing reasons, Allstate's summary judgment motion is granted as to

Plaintiffs' defamation claim insofar as it relies on a *per se* theory, and is denied as to the

defamation claim insofar as it relies on a *per quod* theory and as to the FCRA claim.

September 29, 2015

United States District Judge