IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL RIVERA, STEPHEN          )
KENSINGER, DEBORAH JOY          )
MEACOCK, and REBECCA            )
SCHEUNEMAN,                     )
                                )
                Plaintiffs,     )
                                )
        v.                      )
                                )   Case No. 10 C 1733
                                )
                                )
ALLSTATE INSURANCE COMPANY,     )
                                )
                Defendant.      )

# <u>OPINION AND ORDER</u>

Before the court are post-trial motions after the return of jury verdicts

totaling $27,114,848 in favor of four plaintiffs based on claims of defamation and

violations of the Fair Credit Reporting Act ("FCA"),15 U.S.C. § 1681a(y)(2).

Jurisdiction of the court is based on the FCA. The defamation claims are

governed by Illinois law.

Plaintiffs Daniel Rivera, Stephen Kensinger, Deborah Meacock, and

Rebecca Scheuneman, formerly employed by defendant Allstate Insurance

Company ("Allstate") as professional security analysts, each claim that Allstate

made false statements in a 10-K public report to the Securities and Exchange Commission and in a memorandum issued to its employees. Each plaintiff also claims that Allstate violated the FCA by failing to provide a summary of the communication on which it based its decision to terminate each of them for violation of its code of ethics.

A tortuous interference claim was previously dismissed. *See **Rivera v. Allstate Ins. Co.***, 2010 WL 4024873 (N.D. Ill. Oct. 13, 2010) (Grady, J.). Plaintiffs voluntarily dismissed claims against defendant Judy Greffin and dismissed an age discrimination claim against Allstate. Defendant's subsequent motion for summary judgment was denied. ***Rivera v. Allstate Ins. Co.***, 140 F. Supp. 3d 722 (N.D. Ill. 2015) (Feinerman, J.).

The jury was instructed[1] with respect to the defamation claims that each plaintiff was required to prove that any published statement identified and pertained to such plaintiff. In recognition of Allstate's qualified privilege of publication, the jury was instructed that malice--defined as with knowledge that the statement was false or in reckless disregard of whether it was false--must be

---

[1]The jury instructions are Entry 303 on the docket.

proven by clear and convincing evidence. Because the case was submitted as *per quod* claims, plaintiffs were required to prove actual damages.

Also, the jury was instructed that to prove a violation of the FCA, each plaintiff was required to prove that, at the time of termination, Allstate, "having received a communication in connection with an investigation of suspected misconduct relating to employment," "failed to disclose the nature and substance of the communication" when each plaintiff was fired. The jury was told that to award statutory damages, the failure must be found to be willful.

The motions before the court are Allstate's motions for judgment as a matter of law, or for a new trial and for a remittitur. Plaintiffs' motions, pursuant to the FCRA, are for punitive damages and for attorney fees.

## The Evidence

Allstate is engaged in the property, casualty, life insurance, retirement and investment products business. It is the second largest company in the United States engaging in such business, having assets in excess of $132 billion. Plaintiffs are professional security analysts who were employed as buy-side portfolio managers in the equity division of the Allstate investment department. During the relevant time period, the equity division was managing and investing

approximately $10 billion in capital-growth and capital-value portfolios, including two pension security portfolios.

Each of the plaintiffs has attained a C.F.A. designation, Chartered Financial Analyst or Charterholder. All of the plaintiffs have undergraduate degrees and each, other than Deborah Meacock, has an M.B.A. degree. Stephen Kensington is also a C.P.A. and a Certified Market Technician. According to the C.F.A. Society, which gathers such information, plaintiffs were compensated in the top quadrille of professional security analysts.

Daniel Rivera joined Allstate in 2004. At the time of his termination, he was managing director of the 19-employee equity division and reported to Judy Greffin, Allstate's chief investment officer. Rebecca Scheuneman joined Allstate in 1999. She became an equity portfolio manager and was assigned to the growth team. Deborah Meacock joined Allstate in 2006. At the time of her termination, she was a senior equity portfolio manager on the growth team. Stephen Kensinger joined Allstate in 2007. At the time of his termination, he was an equity portfolio manager on the growth team.

Plaintiffs were paid an annual salary and eligible to earn additional bonus compensation under Allstate's "pay-for-performance" plan. Rivera and

Scheuneman earned a bonus in 2005, 2006, and 2007; Meacock in 2006 and 2007; and Kensinger in 2007. The plan included a cap. In certain years the bonuses also included a subjective amount, at the discretion of senior management. All pay-for-performance compensation was suspended in 2008. Bonuses were discretionary in that year. Starting in 2009, Allstate changed its pay-for-performance measure from a relative return to an absolute return on portfolio values.

In June 2009, Allstate's chief risk and investment compliance officer received an anonymous report that equity division employees might be timing trades to inflate their bonuses. Suspicions focused on an algorithm called the "Dietz method," which had been used by Allstate since the mid-1990s to estimate daily portfolio returns. Owners of security portfolios that have multiple daily cash flows use this formula because it is impractical to use a true time-weighted return to recalculate a portfolio's value when there is a high volume of cash flows.[2] The formula was also used to calculate security analysts' bonuses.

Implementing the Dietz formula requires the selection of a factor, which establishes an assumption regarding the point during the day when cash flows

_____

[2]Peter O. Dietz created this formula in 1966, as explained in his book on performance measurement, *Pension Funds, Measuring Investment Performance.*

occur or peak.  The Dietz factor used by Allstate assumed that the portfolio's net cash flow occurred at mid-day, to provide a rough average of cash flows occurring throughout the day.  The Dietz formula used by Allstate was as follows:

$$\text{Return} = (EMV - BMV) - (P - S) / BMV + DF(P - S).$$

EMV is the market value of the portfolio at the end of the day; BMV is the market value of the portfolio at the beginning of the day; P is purchases; S is sales; and , DF is the Dietz factor.  In Allstate's formula, the Dietz factor was .5, which produces a mid-day return value.  A Dietz factor of .0, for example, will measure return at the end of the day.

It was speculated that, when the mid-day Dietz formula is used, analysts had the ability to do better than the daily measurement by waiting to know whether the market will end up or down.  Delaying trading is a market technique used by all professional security analysts, and it is not alone improper conduct.  If the market is going down, they may execute buy transactions and if the market is going up, they may execute sell transactions which may be more favorable than the daily calculation.  While it is reasonably assumed that all portfolio managers seek to sell on an up day and buy on a down day, if that timing calculation does not take into account the adverse effects in the market of waiting through several

down days to sell or several up days to buy in order to obtain a performance bump, the portfolio could be disadvantaged.  However, when it was adopted Allstate considered that the way the bonus system worked, realized gains or losses on a particular day would offset over time.

When the report of possible improper timing of trades occurred, Allstate became concerned that its public reports to the Securities and Exchange Commission could be inaccurate and that its fiduciary obligations to the pension funds governed by the Employee Retirement Income Security Act, under the oversight of the Department of Labor ("DOL"), could have been violated.  Allstate hired the law firm of Steptoe & Johnson LLP to conduct an investigation of trading practices.  The law firm hired NERA Economic Consulting ("NERA"), an economic consulting firm to aid in the investigation.  An attorney for Allstate testified that the results of the investigation were not submitted to Allstate in writing but reported only orally.  However, after meeting with DOL attorneys in December 2009, Steptoe & Johnson submitted a letter and memorandum to the DOL providing details of the investigation.[3]

---

[3]The letter was ordered produced during discovery over the objection of Allstate.

It was reported to the DOL that none of the anecdotal information provided the parameters of potential disadvantage to the pension plans. A search was made through almost two million e-mails from or to 26 individuals working in Allstate's equity investment management and trading group for the period from May 2003 to May 2009. Only a half dozen e-mails were uncovered which seemed problematic. NERA then analyzed 1,511 trading days during this period which consisted of over 110,000 trades for the pension plans. The report states that there was no evidence that e-mails captured all trading instructions.

NERA used the e-mails to identify 24 instances of delayed trading for one pension plan and 25 instances of delayed trading for the other plan. NERA calculated that the plans' disadvantage from these e-mails indicated delays costing as much as $8.2 million. However, some delays produced gains to the plans of about $6.8 million, resulting in an estimate of a possible net disadvantage of approximately $1.4 million. In addition, for four of the e-mails, tracking the data showed that the trades were made on the same day as the e-mail, which eliminated the trade from the problematic trade group.

The equities group personnel and their supervisors were interviewed by Steptoe & Johnson lawyers. No interviews were reduced to writing. The equities

group understood how the Dietz factor affected its bonuses. No one suggested that the Dietz effect was the only reason or even the primary reason for the timing of a trade. It was, apparently, only one of a few factors used to determine when to execute a trade. Information from the interviews was reported to Allstate's inside counsel orally.

Allstate wanted to be sure that other violations of the law did not occur, such as cross trading, or principal trading. NERA searched for trades where a security with the same identifier would have been bought and sold in the same amount in the same day. No such trades were discovered. Tests were run to determine if the equities group was engaging in any "round trip" transactions-- selling a security, only to buy it back, in order to obtain a performance "bump," or buying a security and then selling it out promptly. No such trades were uncovered.

NERA created an algorithm, an analysis assuming that any sale executed on a market up day (if it was preceded by a down day) and all purchases occurring on a market down day (if preceded by an up day) could have been improperly delayed trades. Looking back to the next preceding day it was assumed that if the instruction had been received on that day, the trade would have been executed on

that day.  Based on these assumptions, a calculation was made to determine what a

purchase would have cost the plan had it been executed on the first down day after

the next preceding up day.  If the amount was greater than the actual trade results,

it was assumed that the difference should be reimbursed.  (The converse analysis

was made for sales.)

Using the stated assumptions, it was reported that the disadvantage to

one plan was $61.5 million and for the other about $17 million.  Adding DOL

underpayment rates brought the total possible reimbursement to approximately

$91 million for the two plans.  However, this calculation ignored all delayed trades

that produced gains to the portfolios which would have reduced the $91 million

figure to at least $53 million.

The conclusion of the report states:

> We believe that this amount, which assumes that nearly
> every trade was inappropriately delayed, overstates any actual
> economic disadvantage suffered by the plans for several
> reasons.  It is unlikely, based on the interviews, that small
> trades were delayed.  Nonetheless, no de minimis exclusion
> was used.  The figures do not exclude the trades made prior to
> midday, even though the Dietz motivation would have
> assumed late afternoon trading.  No time related exclusion
> was used.  In addition, during the past several years of equity
> market volatility, a very large amount of trading throughout
> the markets occurred near the end of the day and it is not
> unreasonable to assume that the Allstate traders were acting in

a similar manner, regardless of any Dietz factor motivation. And, as noted above, there was no netting of "gain days" against "loss days." That netting would have reduced the $91 million to about $53 million. Finally, as discussed earlier, the economic disadvantage calculation was not limited to those trades for which we had clear e-mail indication of Dietz motivation. If we limited the reimbursement to the trades for which we had e-mails showing such motivations the reimbursement would have been $8.2 million and with netting, $1.4 million.

We want to emphasize that the effect of this trading on the total bonuses paid to this group was minimal over the six-year period. Allstate, taking account returns recalculated by NERA, estimated the impact of this trading to the 25 employees who were in the equity group for some or all of 2003 through 2008 as an increase in the aggregate bonuses for the entire group of 25 employees over those years of approximately $1.2 million.

On October 14, 2010, the Vice President, Secretary, and Deputy General Counsel of Allstate wrote, in response to an inquiry from DOL, as follows:

[T]he NERA algorithm was a way for counsel and Allstate to estimate a possible maximum impact of any potential "Dietz" motivated equity trading. No one believed, then or now, that this was an accurate description of the activity on the equity desk, nor that any actual impact on portfolios was anywhere near the result produced by using the NERA algorithm. Just as we wanted to see a possible maximum portfolio impact, we wanted to estimate the corresponding impact on bonuses. If one looked only at the

actual e-mails that arguably could demonstrate bad motivation, there would have been virtually no effect on bonuses

The letter also states, in part:

> Bonuses for the year 2008 were discretionary, and not a result of a formulaic calculation based on equity returns.
>
> * * *
>
> Again, as noted above, the NERA algorithm is not reality; we have no proof that the returns resulting from the algorithm would ever have been realized. Thus, while we asked NERA to rerun the bonus calculations as if the algorithm actually reflected trading activity, the revised bonus calculations are speculative and may be vastly overstated as is the case with the calculation of potential portfolio impact.

Plaintiffs testified at trial of their intent to sell securities when the market was up and to buy securities when the market was down. They denied that their transactions were motivated by an intent to obtain a bonus bump. They did not deny that they were aware of whether or not the Dietz effect was favorable to their bonuses. Plaintiffs stated that their ability to time trades was limited. With the exception of Rivera, plaintiffs did not control the trading desk. Plaintiffs could select securities for purchase and sale, but the trading desk specialists decided the time for the trades. Rivera had the authority to decide when to go into or out of

the market, but he denied he used the authority, leaving that judgment to the trading specialists.

There is no evidence in the record that contradicts plaintiffs testimony. No specific transaction has been traced to any plaintiff to show that a trade was timed or delayed which benefitted a bonus but caused a loss to a portfolio.

On October 6, 2009, Greffin called a meeting of the equity division to announce that Allstate had decided to close the division and outsource the management of the equity portfolios, other than the convertible portfolios managed by two employees, to Goldman Sachs. Seventeen employees, including plaintiffs, were told that they were redundant. The employees were told that severance payments would be made; they could remain in the Allstate office until the end of 2009; and Allstate would provide assistance to them in obtaining new employment.

Immediately after the termination announcement, plaintiffs hired an executive recruiter and also turned to the sell-side brokers, who had been calling on Allstate buy-side brokers, for information about security analyst opportunities. There is evidence that the members of the C.F.A. community of top professional security analysts are acquainted and that the group is not large. Also, there is a

C.F.A. Society information network available to prospective employers. Among other annual questions asked of each C.F.A. member is if the member has been accused of any ethics violation and, if so, how it was resolved.

On December 3, 2009, while plaintiffs were in their offices at Allstate, each was called to an individual meeting with the human resources director Winchell and immediately terminated for cause, without severance benefits, for violation of Allstate's ethics code. No details of any specific violation was provided. Plaintiffs were immediately escorted from the premises and told that would not be allowed to return to the premises without a company escort. Plaintiffs' removals from the premises were immediately obvious and known to the employees of the staff of over 300 in the investment division as well as by sell-side brokers calling on Allstate. Plaintiffs' phones and communication systems were stopped.

On February 25, 2010, Allstate filed its 2009 annual report on Form 10-K with the Securities and Exchange Commission. Under the topic Pension Plans, it was reported, in part, as follows:

**PENSION PLANS**

In 2009, we became aware of allegations that some
employees responsible for trading equity securities in certain

portfolios of two AIC [Allstate Insurance Company] defined benefit pension plans and certain portfolios of AIC and an AIC subsidiary may have timed the execution of certain trades in order to enhance their individual performance under incentive compensation plans, without regard to whether such timing adversely impacted the actual investment performance of the portfolios.

We retained outside counsel, who in turn engaged an independent economic consulting firm to conduct a review and assist us in understanding the facts surrounding, and the potential implications of, the alleged timing of these trades for the period from June 2003 to May 2009 The consulting firm reported that it was unable to determine from our records the precise amounts by which portfolio performance might have been adversely impacted during that period. Accordingly, the economic consultant applied economic modeling techniques and assumptions reasonably designed to estimate the potential adverse impact on the pension plans and the company accounts, taking account among other things, the distinctions between the pension plans and the company portfolios.

Based on their work, the economic consultants estimated that the performance of the pension plans' portfolios could have been adversely impacted by approximately $91 million (including interest) and that the performance of the company portfolios could have been adversely impacted aby approximately $116 million (including interest) in the aggregate over the six-year period under review.  We believe that our financial statements and those of the pension plans properly reflected the portfolios' actual investment performance results during the entire period that was reviewed.

In December 2009, based on the economic consultant's modeled estimates, we paid an aggregate of $91 million into

the two defined benefit pension plans. These payments had no material impact on our reported earnings or shareholders' equity, but reduced our assets, operating cash flows, and unfunded pension liability to the plans. At December 31, 2009, our total assets, operating cash flows and shareholders' equity were $132.65 billion, $4.30 billion and $16.69 billion, respectively. At all times during this period, the plans were adequately funded pursuant to applicable regulatory and actuarial requirements. As a result of these additional funds in the plans, our future contributions to the plans, based on actuarial analysis, may be reduced. Using the economic consultant's calculation of adverse impact on the portfolios, we currently estimate that the additional compensation paid to all the employees working in the affected group was approximately $1.2 million over the six-year period as a result of these activities. In late 2009 we retained an independent investment firm to conduct portfolio management and trading activity for the specific portfolios impacted by these activities. We have reported this matter to the U.S. Department of Labor and the U.S. Securities and Exchange Commission and have advised both agencies that we will respond to any questions they might have.

The same day that Allstate filed its 10-K, Greffin sent a memorandum to the investment department, consisting of over 300 employees, stating:

Allstate released its annual financial report on Form 10-K today. Within that filing, we disclosed details around allegations regarding trading practices within our equity portfolios that came to light in the past year. We took this matter very seriously and launched an investigation as soon as we became aware of the allegations.

Outside counsel was retained to assist us in understanding the facts surrounding, and the potential

implications of, these activities. As part of their analysis, an independent economic consulting firm was retained to estimate the potential adverse impact to the performance of our portfolios. The consultants determined that the performance on some of our portfolios, as well as our two pension plan portfolios could have been adversely impacted by the activities. As a result, Allstate made a contribution to the pension plans during the 4th quarter which is disclosed in the 10-K.

We believe that our financial statements and those of the pension plans properly reflected the portfolios' actual investment performance and the pension plans were adequately funded during the entire period. This matter did not affect the plans' ability to continue to provide benefits to plan participants.

Situations like this can be unsettling and can reflect poorly on our organization. However, I believe organizations are also defined by how they respond to events like this. We were transparent in reporting this matter to the U. S. Department of Labor and the S.E.C., and disclosed to our investors. We're taking steps to improve our governance practices and training.

We remain committed to the highest levels of ethics and integrity in the stewardship of Allstate's assets.

10-K reports are read by the financial community as well as by professional security analysts. After the issuance of the February 10-K report, the recruiter that plaintiffs hired stopped looking for new positions for them. Since then, none of the plaintiffs have been able to find positions comparable to their

positions at Allstate. Meacock and Rivera began looking for lower-paying work outside the United States. Scheuneman and Kensinger could not do that. Scheuneman took a much lower paying unrelated position and Kensinger is still unemployed as a security analyst.

## Motion for Judgment as a Matter of Law

Judgment as a matter of law in favor of a defendant is appropriate only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The court must construe the evidence strictly in favor of the party who prevailed before the jury and examine the evidence only to determine whether the jury's verdict could reasonably be based upon the evidence. *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). The court does not make credibility determinations and must disregard evidence favorable to the moving party that the jury was not required to believe.

Allstate argues that plaintiffs have not proven that any statement identified the plaintiffs; denies that any statement was false and defamatory; states that there was no clear and convincing evidence that Allstate acted with malice so

as to overcome the defense of qualified privilege; and states that plaintiffs have not proved damages.

Defamation can occur even if the name of the person defamed is not mentioned if it is clear that the persons to whom the statement is published would reasonably understand that the statement identified the plaintiff. ***Bryson v. News Am. Publ'ns, Inc.***, 672 N.E.2d 1207, 1218 (Ill. 1996). *See also* Jury Instr. at 19.

The jury had before it abundant evidence that the 10-K and the Greffin memorandum referred to the plaintiffs. The open termination of plaintiffs from the equity division was followed by the reference in the 10-K to "employees responsible for trading equity positions in certain portfolios of two AIC defined benefit pension plans and certain portfolios of AIC and an AIC subsidiary." The 10-K described the transfer of portfolios to an "independent investment firm to conduct portfolio management and trading activity for the specific portfolios impacted by these activities." The Greffin memorandum to the investment department calls attention to the 10-K and repeats the information. This conduct and the publications provided substantial support for the jury to find that the 10-K and the Greffin memorandum identified and referred to the plaintiffs.

To overcome the defense of qualified privilege to publish the 10-K, plaintiffs were required to prove that the statement was made with knowledge of its falsity or in reckless disregard of whether it was false or true. *Mittelman v. Witous*, 552 N.E.2d 973, 981 (Ill. 1989) (adopting **Restatement (Second) of Torts** § 600, cmts. a, b (1977)). *See also* Jury Instr. at 22. Reckless disregard is defined as proceeding to publish defamatory matter despite having an awareness of probable falsity, or serious doubts as to the truth of the publication. *Id.* (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U. S. 657, 667 (1989)).

The 10-K asserts that responsible employees "may have timed the execution of certain trades to enhance their individual performance under incentive compensation plans without regard to whether such timing adversely impacted the actual investment performance of the portfolios." It is stated that losses to the pension plans were estimated to be as much as $91 million. The performance of the company portfolio "could have been adversely impacted by approximately $116 million." Additional bonus compensation from timed trades was estimated to be approximately $1.2 million over a six year period. It is further stated in the 10-K that an investigation was undertaken, the portfolios were

transferred to an investment firm, and the SEC and DOL were informed of serious misconduct.

The 10-K recited a serious charge of timed trading resulting in substantial losses and unearned bonuses. However, based on the evidence, the jury could find the loss statements to be false, unproven as to the plaintiffs and, because of their nature, seriously defamatory as to plaintiffs.

The plaintiffs testified that they did not time trades to enhance their bonuses. No specific documentary or testimonial evidence was offered to dispute their testimony as to any trade. The $91 million loss to the funds was admittedly incorrect if not unfounded. It was not adjusted for, among other things, instances in which the funds benefitted by delayed trades. Such adjustment, or the acknowledgment of the propriety of such adjustment, would have significantly reduced the alleged estimate of loss to the funds and would have eliminated the $1.2 million bonus overcompensation estimate.

Counsel for Allstate told the DOL that "[i]f one looked only at the actual e-mails that arguably could demonstrate bad motivation, there would have been virtually no effect on bonuses." The jury could well find that there was knowledge of the falsity of the 10-K.

There is clear and convincing evidence that the statements in the 10-K were false and made in reckless disregard of their defamatory affect on the reputations of the plaintiffs.

That plaintiffs were unable to obtain comparable re-employment was shown by the evidence. There was ample evidence of damage to plaintiffs' reputation which provided proof of damages.

Allstate's motion for judgment as a matter of law must be denied.

### The Motion for a New Trial

Allstate seeks a new trial pursuant to Fed. R. Civ. P. 59, claiming that plaintiffs improperly introduced evidence and arguments surrounding the unfairness of their terminations; that the court erred in refusing to instruct the jury concerning plaintiffs' failure to make timely production of job search documents; and testimony concerning the conduct of a job search recruiter should have been excluded.

Allstate's argument that the evidence relating to terminations of plaintiffs was not proper proof overlooks that the proof was appropriate to show that readers of the 10-K would know of the circumstances surrounding their firing when reading the 10-K, and know that the 10-K referred to them. Moreover, the

- 22 -

related FCRA claims in this case had to do with circumstances of plaintiffs' terminations. An abrupt termination was a factor to be considered when deciding whether there has been a willful failure to provide a summary of the investigation on which the action was taken at the time of the termination.

Plaintiffs failed to make a timely production of job search documents. As a consequence, it was ruled that neither plaintiffs nor their expert could rely on the material. Defendant claims that their untimely production prevented an investigation of the validity of the material. The delay of production did not impact the trial or have any impact on any of the proof.

Plaintiff Meacock testified that executive recruiter Cathy Graham stopped looking for positions for the plaintiffs after the 10-K was issued. Meacock was not allowed to testify to any conversations with Graham, who was on the plaintiffs' witness list. Ultimately, plaintiffs were unable to call Graham. Meacock's statement that Graham stopped looking for employment for plaintiffs was allowed to stand as non-verbal conduct not considered to be hearsay within the meaning of Fed. R. Evid. 801.

Allstate's motion for a new trial will be denied.

## Remittitur

Allstate argues that the compensatory and punitive damages awarded are excessive and must be reduced. Both sides introduced damages evidence. The court's analysis is guided by three factors: whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence; and whether the award is roughly comparable to awards in similar cases. The court must review the record in the light most favorable to the verdict. *G. G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011); *Farfaras v. Citizens Bank & Trust*, 433 F.3d 558, 566-67 (7th Cir. 2006); *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

The jury verdict entered against Allstate was as follows: Daniel Rivera $7,156,972 defamation damages, $4,000,000 punitive damages, and $1,000 FCRA damages; Deborah Meacock $3,602,317 defamation damages, $3,000,000 punitive damages, and $1,000 FCRA damages; Stephen Kensinger $2,913,531 defamation damages, $2,000,000 punitive damages, and $1,000 FCRA damages; and Rebecca Scheuneman $3,438,028 defamation damages, $1,000,000 punitive damages, and $1,000 FCRA damages.

Both sides in this case introduced expert damages evidence which included the experts' reports as joint exhibits. The jury awarded approximately $17.1 million in compensatory damages to the four plaintiffs. Plaintiffs' expert computed damages of approximately $21 million. Allstate's expert found that, if liability existed, damages would be in the range of $11.1 million.

The jury was not without guidance from the parties, and it did not deviate from the range of damages found by the experts. Also, there has been no showing by Allstate that the awards exceed damages in similar cases. Accordingly, there is no basis to set aside the compensatory damage verdicts.

With respect to punitive damages, the jury was instructed, in part, that it may assess punitive damages if it found that the "defendant was malicious or in reckless disregard of a particular plaintiff's rights." Jury Instr. at 33. On this record, the jury could make such a finding. The amount of punitive damages awarded, $10 million, approximately 60% of the compensatory damages, was not out of proportion with appropriate standards for the award of such damages. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-85 (1996); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).

Allstate's motion for a remittitur of compensatory and punitive damages will be denied.

## FCRA Punitive Damages and Attorney Fees

Plaintiffs have moved for a determination by the court of punitive damages under 15 U.S.C. § 1681n(a)(2), which provides for punitive damages for willful noncompliance with the FCRA.

The jury made a separate determination that Allstate's violations of the FCRA were willful. Allstate opposed the submission to the jury of the issue of the amount of punitive damages. The language of the statue -- "such amount of punitive damages as the court may allow" -- is open to the interpretation that the issue is for the court and not for the jury. The issue was reserved and is now before the court.

Allstate argues that it complied with § 1681a(y)(2) which requires, after taking any adverse action based on "a communication made to an employer in connection with an investigation of suspected misconduct," the employer shall disclose "the nature and substance of the communication." Alternatively, it contends that the statute is unclear as to what is required and, because it has not been construed, Allstate should not be liable.

Brett Winchell, the director of human resources for the investment division of Allstate, notified each plaintiff of termination. He was not involved in the trading investigation and did not speak to the lawyers or consultants who made oral reports to Allstate counsel.

Winchell testified that his conversations with plaintiffs were based on a script which included five bullet points. The first was to remind them that there had been an investigation of the pay-for- performance plan; second, that they had been interviewed once or several times by attorneys; third, the decision had been made to terminate the employee for cause immediately, without severance benefits, for violation of the conflict-of-interest policy of the Allstate Code of Ethics; fourth, that the decision was probably not what the employee expected; and fifth, an apology was made for the length of time it took to provide this information. No mention was made to any plaintiff of a specific delayed trade timed to enhance a bonus. No mention was made of any specific adverse affect from any trade. It is doubtful whether Winchell was aware of a summary of the investigation.

Later, when counsel for the plaintiffs requested a summary of the investigation, counsel for Allstate replied that there was no written summary and, accordingly, there was nothing to provide.

Allstate argues that there is no requirement in the statute for a written summary and it isn't clear what is required by he statute. The argument is unreasonable. The statue is clear without construction. It is intended to provide an employee with the information, oral or written, when an "adverse action," (firing) is based, on a "communication made to an employer in connection with an investigation of suspected misconduct relating to employment." That is what happened in this case. Compliance in this case would have revealed that, after an extensive investigation, Allstate did not have proof that any delayed trade by any of the plaintiffs was a timed trade intended to enhance a bonus at the expense of a portfolio security. Had there been compliance with the statute, the termination conversation, as intended by the statute, would not have been only one-way. There is ample evidence to support the jury finding of a willful violation of the statutory duty.

The FCRA provides for the imposition of punitive damages for willful noncompliance of any requirement of the act. On the facts of this case, it is

appropriate to observe that the jury awarded full compensatory and significant punitive damages to the plaintiffs on the defamation claims, and plaintiffs are allowed to claim costs and attorney fees. Accordingly, the court will award each plaintiff, as punitive damages, triple the $1,000 statutory damages awarded by the jury. The plaintiffs' claims for punitive damages of greater sums are denied.

In the event of willful noncompliance of the FCRA, a defendant is liable for the costs of the action together with reasonable attorney fees as determined by the court. 15 U.S.C. § 1681n(a)(3). Plaintiffs' motion for the allowance of costs and attorney fees will be granted.

IT IS THEREFORE ORDERED AS FOLLOWS:

(1) Defendant's motions for judgment as a matter of law [296, 310], for a new trial [313], and for remittitur [316] are denied.

(2) Plaintiffs' motions for FCRA punitive damages [320] and costs and attorney fees [322] are granted.

(3) The Clerk of the Court is directed to enter a supplemental judgement in favor of plaintiffs Rivera, Kensinger, Meacock, and Scheuneman in the amount of $3,000 each against defendant Allstate Insurance Company as punitive damages imposed as a result of wilful violations the Fair Credit Reporting Act.

(4) By January 30, 2017, plaintiffs shall submit their bill of costs.

Consolidated answer to fee and cost petitions is to be filed by February 13, 2017.

Reply is due February 21, 2017.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  JANUARY 20, 2017